[No. 7938–7–I.   Division One.   June 29, 1981.]

THE STATE OF WASHINGTON, *Respondent,* v. LARRY L. DORMAN, *Appellant.*

*Berkey & Kooistra* and *Brad Kooistra,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Janice Elling-ton, Deputy,* for respondent.

SWANSON, J.—Larry L. Dorman was convicted by a jury of nine counts of second degree theft and one count of first degree theft under RCW 9A.56.020(1)(a).[1] The theory of the State's case was that Dorman, as trustee of a trust account, had appropriated for his own use money deposited in the account.

The prosecution arose out of a series of transactions in which Dorman collected checks from several buyers as deposits and finder's fees for the purchase of 4–wheel drive vehicles which were to be shipped to Seattle after being used in the construction of the Alaska pipeline. The terms of Dorman's written contract with the buyers were essentially as follows: The buyers paid Dorman's corporation, Tahoe Enterprises, Inc., deposits representing a percentage of the purchase price of the vehicle and a finder's fee for Dorman, with the remainder to be applied toward the cost of shipping the vehicles from Alaska. The money so deposited was to be held in a trust account at the Bellevue Branch of Seattle–First National Bank. The buyers would be allowed to inspect the vehicles as they arrived in Seattle. Each buyer was to have 48 hours after the inspection within which to decide if he desired to go forward with the pur-

---

[1] "'Theft' means:

"To wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him of such property or services; . . ." RCW 9A.56.020(1)(a).

chase. Full refunds, including the finder's fee, were to be made to those buyers who decided not to purchase.

In addition to the written terms of the contract as outlined above, Dorman pointed out to prospective buyers that a Seattle attorney, Peter Francis, was a cosigner on the trust account. Thus, Dorman asserted, the account was more secure. The State's evidence also showed that Dorman specifically stated to some of the buyers that the money would remain in the trust account until applied toward purchase of a vehicle or until refunded.

Bank records introduced at trial indicated that Dorman eventually collected nearly $44,000 from some 57 potential buyers. However, the anticipated arrival date of the vehicles was delayed, and buyers began requesting refunds. Some refunds were made, but, generally, Dorman stalled for time. He explained to several buyers that the delay was caused by threatened strikes and the like. In the meantime, Dorman, on one occasion, obtained attorney Francis' signature and made a $6,500 withdrawal, explaining to Francis that the money was for refunds. However, Dorman actually put the money into his personal checking account. In addition, Dorman transferred money from the trust account directly into Tahoe Enterprises, Inc.'s checking account without obtaining Francis' signature. Of the money transferred to the corporation checking account, $17,000 was refunded to buyers, while $7,800 was transferred to Dorman's personal checking account and spent. The remainder, approximately $10,814, was used directly by Dorman for personal expenses.

The record reveals that Peter Francis' only role in the matter was to lend his signature to Dorman, a former client, as a favor. He had no connection with the business venture and was apparently asked by Dorman only once to cosign for a withdrawal.

The vehicles eventually arrived several months after Dorman first began accepting deposits. It was then, however, that Dorman and his buyers learned that the man from whom Dorman believed he was purchasing the trucks

did not own them and had, in fact, disappeared with the $5,000 deposit paid to him. Dorman was unable to make subsequent refunds to the complaining witnesses, and this prosecution followed.

Dorman's first assignment of error relates to the court's instruction No. 9 which stated:

As used in these instructions, intent to deprive means the intent to convert the property of another to one's own use.

*The proof of intent to deprive does not require the establishment of the intent to permanently deprive.*

(Italics ours.)

Dorman argues that the giving of the italicized portion of the instruction was error because the new criminal code has eliminated the distinction that previously existed between the mental states of larceny and embezzlement. Thus, Dorman argues, in a prosecution for theft under RCW 9A.56-.020(1), the State must prove that the defendant intended to permanently deprive the victim of his property, even if the crime charged would have been as embezzlement under prior law. We disagree.

█ Dorman was charged with theft by exerting unauthorized control over the property of another. Under RCW 9A.56.010(7), "exerts unauthorized control" is defined to mean:

(a) To take the property or services of another; or

(b) Having any property or services in one's possession, custody or control as bailee, factor, pledgee, servant, attorney, agent, employee, trustee, executor, administrator, guardian, or officer of any person, estate, association, or corporation, or as a public officer, or person authorized by agreement or competent authority to take or hold such possession, custody, or control, to secrete, withhold, or appropriate the same to his own use or to the use of any person other than the true owner or person entitled thereto;

Thus, the definitional section of the theft statute makes clear that RCW 9A.56.020(1)(a) includes what was embezzlement under prior law. *See State v. Smith,* 2 Wn.2d 118,

98 P.2d 647 (1939); *State v. Larson,* 123 Wash. 21, 211 P. 885 (1923).

In *Larson,* the very contention Dorman makes here was rejected. The defendant had requested an instruction to the effect that intent to permanently deprive was an element of embezzlement. The court observed that the general rule was that the fact that an embezzler offers to return, or does return, what he has fraudulently converted, does not bar prosecution, because the offense is completed at the time of the conversion. The court concluded,

> [H]ad the instruction as worded been given, it would have, in effect, advised the jury that an intention on his part to repay or make restitution would wipe out the crime or purge the appellant of the offense. Such is not the law. The intention to return the money embezzled, or even the actual restitution, does not absolve the guilty party.

*Larson,* at 35. *See also* 26 Am. Jur. 2d *Embezzlement* § 20 (2d ed. 1966).

Dorman argues, however, that *State v. Burnham,* 19 Wn. App. 442, 576 P.2d 917 (1978), holds that intent to permanently deprive is an element of all types of theft under RCW 9A.56.020(1). Such is not the case. *Burnham* specifically notes that under prior statutes the charge would have been couched in terms of larceny for taking, leading, or driving away the property of another. Thus, embezzlement was not at issue. Moreover, the *Burnham* court recognized that its holding was limited to factual situations which would have been larceny by taking under prior law:

> We note, however, that Washington has historically permitted convictions for embezzlement to stand without a showing that defendant acted with an intent to *permanently* deprive the owner. This is so because not all of the crimes listed in former RCW 9.54.010 would have constituted "larceny" at common law.

(Citations omitted.) *State v. Burnham, supra* at 445 n.3.

We find nothing in the current criminal code to suggest that the historical distinction between larceny and embezzlement has been eliminated. In fact, given that RCW

9A.56.010(7)(b) is essentially identical to embezzlement under former RCW 9.54.010(3), we can only conclude that the legislature intended that the distinction be maintained. The trial court did not err in instructing that intent to permanently deprive was not an element of the crime.

Dorman next argues that the trial court erred in failing to instruct the jury that it was the State's burden to prove beyond a reasonable doubt the absence of a good faith claim of title on the part of the defendant. RCW 9A.56-.020(2) provides:

> In any prosecution for theft, it shall be a sufficient defense that the property or service was appropriated openly and avowedly under a claim of title made in good faith, even though the claim be untenable.

■ Dorman cites no authority which specifically holds that a defendant is entitled to an instruction placing the burden on the State to disprove the so–called statutory defense, and, under these facts, such an instruction was unnecessary. The jury was instructed generally regarding the statutory defense. The jury was also instructed that to convict it must find beyond a reasonable doubt that Dorman, as a trustee, exerted unauthorized control over the property of the buyers. The evidence supporting the defendant's good faith claim of title was his testimony that he believed the money was his to do with as he wished. As the State points out in its brief, such a claim was directly contrary to the State's theory of the case. The jury found Dorman guilty and thus must have disbelieved the defendant's good faith claim of title. It was not error to refuse the defendant's requested instruction allocating the burden of proof to the State because the jury was properly instructed regarding the burden of proof and the necessity of finding a trust relationship. *Cf. State v. Hanton*, 94 Wn.2d 129, 614 P.2d 1280 (1980) (instruction allocating to the State burden of disproving self–defense not necessary when jury was properly instructed on recklessness).

■ Dorman argues next that the court's instructions defining "exerts unauthorized control," "trust," and "trus-

tee" effectively directed the jury to find the existence of a trust relationship and thus denied him the right to trial by jury. We disagree that the instructions removed from the jury's consideration a question of fact regarding the existence of a trust. The State's evidence tended to show that Dorman represented that the money deposited would remain in the trust account until the prospective buyers decided whether or not they wished to purchase a vehicle. The evidence further suggested that Dorman stressed the trust nature of the account in assuring buyers that their deposits would be safe. The court's instructions merely defined what was meant by the various terms, including "trust." Dorman does not contend that the instructions were incorrect statements of the law. Moreover, the instructions permitted Dorman to argue his theory of the case. *State v. King,* 92 Wn.2d 541, 599 P.2d 522 (1979). Dorman's defense was that he did not tell prospective purchasers that the money would remain in the trust account and that he believed the money was his to do with as he wished. The jury was free to believe the defense claims, and if it did, no trust existed.

Dorman's fourth assignment of error relates to the court's failure to give his requested instruction which stated:

> All payments made to Mr. Dorman were in the form of negotiable instruments as defined in law. The transfer of a negotiable instrument gives to the receiver all the legal rights of title and ownership which the person giving the instrument possessed at the time of the transfer.

His argument is that the requested instruction was a correct statement of negotiable instruments law and failure to give it precluded him from arguing his theory that he had the right to use the money as he saw fit. However, as noted above, Dorman was free to argue his defense under the instructions as given. Although a defendant is entitled to argue his theory, he is not entitled to put his argument into the court's instructions. *State v. Birdwell,* 6 Wn. App. 284, 492 P.2d 249 (1972).

Because we conclude it was not error to refuse Dorman's instruction, we need not reach the State's contention that the instruction was not relevant to Dorman's subsequent embezzlement of funds legally acquired. However, we agree with the State insofar as it suggests that Dorman's argument would lead to the absurd result that a trustee who receives checks cannot, under negotiable instruments law, embezzle the funds, while one who accepts cash can.

Dorman's fifth assignment of error is that the evidence was insufficient as a matter of law. He first argues that the State did not prove that he did not assume "full ownership rights in the funds transferred to him such that he could not be found guilty of theft."

■ In a challenge to the sufficiency of the evidence, our function is to determine whether any rational trier of fact could have found the elements of the crime charged beyond a reasonable doubt. *State v. Green,* 94 Wn.2d 216, 616 P.2d 628 (1980). To convict Dorman, the jury had to find that he exercised unauthorized control over the property of the several buyers, *i.e.,* that he had property in his possession, custody, or control as a trustee and appropriated the property for his own use. As noted, the State's evidence was that he told the buyers the money would remain in trust and would be refunded in full to those who desired not to purchase. From such evidence, a rational trier of fact could have found the elements of the crime charged beyond a reasonable doubt.

Dorman's second argument relating to the sufficiency of the evidence is that the State failed to prove anything more than a series of withdrawals from the trust account. However, the State put on sufficient evidence in the form of bank statements and testimony by bank personnel showing that a total of approximately $44,000 was deposited in the trust account and that $17,000 was refunded to purchasers, but the remainder was used by Dorman for personal purposes.

■ Dorman's sixth assignment of error is that Peter Francis' testimony fell within the attorney/client privilege

contained in RCW 5.60.060(2). The trial court, however, carefully considered the question and ruled that no attorney/client relationship existed. We agree. The record reveals that no legal advice was sought or given, no fee was paid, and the attorney felt he was cosigning on the account merely as a favor for a former client. As a leading text puts it:

> The privilege for communications of a client with his lawyer hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice. . . . Payment or agreement to pay a fee, however, is not essential. But where one consults an attorney not as a lawyer but as a friend or as a business adviser or banker, or negotiator, or as an accountant, or where the communication is to the attorney acting as a "mere scrivener" or as an attesting witness to a will or deed, or as an executor or as agent, the consultation is not professional nor the statement privileged.

(Footnotes omitted.) E. Cleary, *McCormick on Evidence* § 88 (2d ed. 1972).

■ Dorman's seventh and eighth assignments of error relate to evidentiary rulings by the trial court, specifically, admission of computer–generated banking records and admission of a deposition by an unavailable witness. Rulings on evidentiary matters, including the admissibility of business records, are generally within the discretion of the trial court. *E.g., DeYoung v. Campbell*, 51 Wn.2d 11, 315 P.2d 629 (1957). We have reviewed the record and find no abuse of discretion.

Affirmed.

JAMES, C.J., and WILLIAMS, J., concur.

Reconsideration denied August 11, 1981.

Review denied by Supreme Court November 20, 1981.