[Nos. 45289-4-I; 46534-1-I. Division One. February 19, 2002.]

THE STATE OF WASHINGTON, *Respondent*, v. TED J. GRIMES, *Appellant.*

546

*Ted J. Grimes*, pro se.

*Cheryl D. Aza* (of *Washington Appellate Project*), for appellant.

*Norm Maleng*, *Prosecuting Attorney*, and *Lynn S. Prunhuber*, *Deputy*, for respondent.

AGID, C.J. — Ted Grimes appeals his three convictions for theft of 26 U.S.C. § 1031 exchange funds, asserting that (1) federal tax deferral law preempts state theft law, (2) there is insufficient evidence to support his convictions, (3) the "good faith claim of title" instruction contained erroneous and prejudicial language, (4) the instruction defining escrow accounts was reversible error because it obscured the distinction between escrow and § 1031 accounts, and (5) the court erred by refusing to give his proposed instruction on § 1031 accounts and in excluding evidence of repayment. Grimes also maintains that the restitution orders are improper. Because federal law does not preempt Washington's theft law, there was sufficient evidence to support Grimes' convictions for theft of § 1031 funds, the jury instructions were neither erroneous nor prejudicial, the restitution orders were proper, and the trial court

properly excluded evidence of repayment, we affirm the convictions.

## FACTS

Ted Grimes was the former president, designated escrow officer, and sole manager of Pacific Coast Escrow, Inc. (PCE). He also operated Pacific Coast Data Services, Inc. (PCDS), and Pacific Coast Financial Services, Inc. (PCFS), out of PCE's office in Federal Way. PCDS facilitated real estate transactions under § 1031 of the Internal Revenue Code, 26 U.S.C. § 1031. Grimes' theft convictions arose from two types of funds he held for others: escrow and § 1031 exchange accounts.

Grimes was PCE's designated escrow officer and was responsible for all transactions. He was also responsible for all transactions by PCDS and PCFS. Grimes owned 25 percent of PCE, and Sherry McLean, Ted Gartner, and the Carino Family Trust owned the rest in equal shares. Grimes was the president and designated escrow officer, McLean was the secretary, and Gartner was a director. Grimes and McLean formed PCDS shortly after PCE was incorporated, and they owned it in equal shares. In 1994, Grimes, his wife, and Rik Hall formed PCFS, which Grimes ran as a mortgage brokerage.

Through PCDS, Grimes facilitated § 1031 exchange trans-actions.[1] He acted as a qualified intermediary for § 1031 exchanges for William and Janice Fawthrop, Ward and Deanne Truess, and Robert and Bernice Millard. Through PCFS, Grimes acted as a lender. He loaned § 1031 exchange funds deposited into PCDS's account to PCFS, and PCFS in turn made commercial loans with those funds. Grimes loaned his clients' money at high interest rates so that he could pay for his house-building and other personal and business expenses. The total loss to the victims was over

---

[1] In a 26 U.S.C. § 1031 exchange, a taxpayer realizes no taxable gain upon the exchange if the property held for productive use is exchanged for like-kind property. Section 1031 is an exception to the general rule requiring recognition of gain or loss when property is sold or exchanged.

$600,000, which was increased by their tax losses and other consequences. He never told his § 1031 clients that he was lending out the exchange funds, and the loans violated the § 1031 agreements with his clients which provided that the funds were to be kept in a separate escrow account. None of the notes for loans were payable to PCDS, and Grimes had no written loan agreements between PCFS and PCDS. PCDS had no security interest in any assets of PCFS.

The monthly reconciliations of PCE's escrow account from January through October of 1995 showed increasing overdrafts in escrow subaccounts. Grimes used false entries in the computerized accounting system of the pooled escrow account to cover up his thefts, which in turn allowed him to take more funds from the accounts. Grimes admitted that PCE's records showed seven accounts overdrawn on June 6, 1995, in the amount of $271,756. He also agreed that the accounts were in arrears an additional $209,661, the amount of the credit balance. Grimes said he reviewed the daily reports and agreed that the June 30, 1995 daily report showed an overdraft of $62,094 in PCE's escrow account, which meant there was over $62,000 more in checks outstanding against the trust account than funds in the account. By the end of September of 1995, PCE's trust account had a negative balance of $357,003. PCE's computer records showed escrow liabilities of $282,935. Thus, PCE's shortfall as of September 1995 was $639,938. Grimes admitted there was a negative balance, but disagreed with the exact amount.

McLean learned of the overdrafts in PCE's escrow trust account in October, 1995. She also learned that Grimes opened a branch office without the Board of Directors' permission. On October 23, 1995, McLean and the other PCE directors fired Grimes, notified the Department of Financial Institutions (DFI) of PCE's financial condition, and asked the State to audit the books and tell the directors how to proceed. Audits by DFI and PCE's accountant showed large shortfalls in the escrow trust account. PCE

closed as of October 31, 1995, and declared bankruptcy. PCE had a fidelity bond with Safeco Insurance Company, and Safeco paid the full $500,000 policy limit because it determined that the loss attributable to Grimes far exceeded the policy limit. The victims were repaid most of their losses out of the fidelity bond and the assets recovered in bankruptcy. After these payments, PCE still owed the victims $116,102.

Grimes was charged with eight counts of theft in the first degree and one count of theft in the second degree for exerting unauthorized control over escrow funds and § 1031 transactions. In the alternative, the State alleged he obtained control of his clients' money by color and aid of deception for all but three of PCE's clients: the Millards, the Truesses, and John Fujii.

A jury convicted Grimes of seven counts of first degree theft and one count of second degree theft. The trial court imposed exceptional sentences of 60 months for each of the first degree theft convictions and 37 months for his second degree theft conviction, to run concurrently. The court also entered an order requiring Grimes to pay his victims $116,102. It later entered supplemental restitution requiring Grimes pay $500,000 to Safeco for the fidelity bond funds it paid the victims. This appeal followed.

## DISCUSSION

 Preliminarily, Grimes maintains that 26 U.S.C. § 1031 preempts state law and prevents the State from prosecuting him because, he argues, prosecution for theft of § 1031 exchange funds conflicts with federal tax law. The preemption doctrine is based on the Supremacy Clause of the United States Constitution.[2] " 'Consideration under the Supremacy Clause starts with the basic assumption that

---

[2] U.S. CONST. art. VI.

Congress did not intend to displace state law.' "[3] State law is preempted if Congress passes a statute that expressly preempts it, Congress occupies an entire field of regulation, state law conflicts with federal law, making compliance with both an impossibility, or state law presents an obstacle to accomplishing the federal purpose.[4] There is a strong presumption against preemption, and state laws are not preempted in the absence of a clear and manifest congressional purpose.[5] The party asserting preemption has the burden of proof.[6]

Grimes asserts that federal law requires an intermediary in a § 1031 transaction to "take over the exchangor's rights and obligations on the property, or the proceeds, for a limited period of time," and that by prosecuting him, the State prevented him from completing his contractual agreements under federal law. He asserts that if his actions constitute a crime under Washington law, the residents of Washington would be deprived of the tax benefits afforded by federal law, i.e., § 1031 exchanges.

■■■■ But federal law does not require an intermediary take over an exchangor's rights. In *In re Exchanged Titles, Inc.*,[7] a California bankruptcy court concluded that the title an intermediary in a § 1031 exchange receives is a limited interest, and that it is formal rather than real. Quoting the Ninth Circuit's decision in *Alderson v. Commissioner*,[8] the *Exchanged Titles* court stated that:

---

[3] *Stevedoring Servs. of Am., Inc. v. Eggert*, 129 Wn.2d 17, 23-24, 914 P.2d 737 (1996) (quoting *Bldg. & Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 224, 113 S. Ct. 1190, 1194, 122 L. Ed. 2d 565 (1993)).

[4] *Id.* at 23 (citing *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 265, 884 P.2d 592 (1994)).

[5] *Id.* at 24; *Alverado v. Wash. Pub. Power Supply Sys.*, 111 Wn.2d 424, 432, 759 P.2d 427 (1988), *cert. denied*, 490 U.S. 1004 (1989).

[6] *Inlandboatmen's Union of the Pac. v. Dep't of Transp.*, 119 Wn.2d 697, 702, 836 P.2d 823 (1992).

[7] 159 B.R. 303 (C.D. Cal. 1993).

[8] 317 F.2d 790 (9th Cir. 1963).

"[for] the purpose of the exchange . . . there was no need for [the accomodator] to acquire a 'real' interest in the . . . property by assuming the benefits and burdens of ownership to make the exchange qualify under the statute . . . . [One] need not assume the benefits and burdens of ownership in property before exchanging it but may properly acquire title *solely for the purpose of exchange* and accept title and transfer it in exchange for other like property . . . ."[9]

In addition, the regulations governing § 1031 exchanges provide that a taxpayer retains all rights to the funds except the ability to use and benefit from the money or property before the end of the exchange period. 26 C.F.R. § 1.1031(k)-1(g)(6)(i) provides:

An agreement limits a taxpayer's rights as provided in this paragraph (g)(6) only if the agreement provides that the taxpayer has no rights, except as provided in paragraph (g)(6)(ii) and (g)(6)(iii) of this section, to receive, pledge, borrow, or otherwise obtain the benefits of money or other property before the end of the exchange period.

The agreements between PCE and Grimes' § 1031 clients had such a provision. Thus, federal tax deferral law under 26 U.S.C. § 1031 does not preempt the State's theft prosecution because an intermediary like Grimes need not acquire a "real" interest in the property to close the transaction. Nothing more than legal title is needed to effectuate a § 1031 exchange.[10]

■ Grimes' convictions for first degree theft[11] were based on his stealing three clients' § 1031 funds. He con-

---

[9] 159 B.R. at 306 (alterations in original) (quoting *Alderson*, 317 F.2d at 795).

[10] *Id.* at 305-06.

[11] RCW 9A.56.020(1) defines theft as:

(a) To wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him of such property or services; or

(b) By color or aid of deception to obtain control over the property or services of another or the value thereof, with intent to deprive him of such property or services; or

(c) To appropriate lost or misdelivered property or services of another, or the value thereof, with intent to deprive him of such property or services.

tends that there was insufficient evidence to support his convictions because neither federal law, state law, nor his contractual agreements barred his conduct. Specifically, Grimes argues that he did not exert "unauthorized control" over the § 1031 exchange funds because he obtained full title to them under 26 U.S.C. § 1031 and the contractual agreements. This, he asserts, prevented the State from proving the "property of another" element of theft. If he had title to the property, he could not exercise unauthorized control over it. We review claims that the evidence was insufficient by determining whether, after viewing the evidence most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[12]

 Grimes' assertion that he had full control over the property under § 1031 law is erroneous because, as the Supreme Court said in *State v. Pike*, "even where a person possesses legal title to a given item, theft can occur if that person takes the item from another who has a superior possessory interest."[13] In *State v. Joy*, the court stated that the meaning of the "property of another" element can be derived from the definition of owner.[14] It held that an "owner" is " 'a person, other than the actor, who has possession of or any other interest in the property or services involved, and without whose consent the actor has no authority to exert control over the property or services.' "[15] The *Joy* court also stated that proving the "property of another" element of theft does not require proof that title must strictly be in the other person.[16]

> If the particular agreement between the owner and defendant restricted the use of the funds to a specific purpose, the owner would have an interest in the money, *i.e.*, the application of the

---

[12] *State v. Hampton*, 143 Wn.2d 789, 792, 24 P.3d 1035 (2001).

[13] 118 Wn.2d 585, 590, 826 P.2d 152 (1992).

[14] 121 Wn.2d 333, 341, 851 P.2d 654 (1993) (citing *Pike*, 118 Wn.2d at 589).

[15] *Id.* at 340-41 (quoting RCW 9A.56.010(8)).

[16] *Id.* at 340.

money to the purpose for which it was entrusted to defendant.[17]

And, as we stated above, the regulations governing § 1031 exchanges provide that a taxpayer retain all rights in the proceeds except use and benefit of the money or property before the exchange period ends. Because Grimes did not have full title over his clients' § 1031 accounts, the "property of another" element of RCW 9A.56.020 was satisfied.

 Grimes asserts that he did not exert "unauthorized control" over the § 1031 funds because a taxpayer must give up his entire claim to the property, federal law does not bar his conduct, state escrow law does not apply to § 1031 funds, and the contractual agreements did not restrict what he could do with the funds between receipt and disbursal. We have already rejected Grimes' first assertion. We need not address his second argument because Grimes is not charged with violating federal law and, aside from his § 1031 contentions, he does not argue it preempts state theft law. Finally, Grimes' argument that state escrow law does not apply to § 1031 funds fails because he failed to deposit the funds in separate escrow accounts, did not hold the funds in trust for the purpose of the transactions, used the funds for his benefit or the benefit of unentitled persons, and the version of RCW 18.44.010(3) in effect when he committed these offenses explicitly included exchange transactions.[18]

---

[17] *Id.* at 341 (citing Wayne R. LaFave & Austin W. Scott, Jr., Handbook on Criminal Law § 89, at 648 (1972)).

[18] Former RCW 18.44.010(3) (1995) provided:

"Escrow" means any transaction wherein any person or persons, for the purpose of effecting and closing the sale, purchase, *exchange*, transfer, encumbrance, or lease of real or personal property to another person or persons, delivers any written instrument, money, evidence of title to real or personal property, or other thing of value to a third person to be held by such third person until the happening of a specified event or the performance of a prescribed condition or conditions, when it is then to be delivered by such third person, in compliance with instructions under which he is to act, to a grantee, grantor, promisee, promisor, obligee, obligor, lessee, lessor, bailee, bailor, or any agent or employee thereof.

■ That leaves his argument concerning the contractual agreements, and we hold there was sufficient evidence to find that Grimes committed theft under those agreements. They provided in part:

> Exchangor agrees to transfer the Exchange Property to Facilitator. Facilitator agrees to sell the Exchange Property to the Buyer of such property under the terms and conditions of the Agreement between Exchangor and Buyer. Facilitator agrees to substitute as seller of the Exchange Property. Facilitator may instruct Exchangor to convey the Exchange Property directly to the Buyer, or to the ultimate recipient of such property, for reasons unrelated to Federal Income Tax.
>
> *Facilitator agrees that it shall use the net equity it receives from the sale of the Exchange Property to acquire the Target Property.*

Janice Fawthrop, Deanne Truess, and Robert Millard testified that Grimes told them he was going to put their money in an escrow account and hold it there until he acquired new property with their funds. The three § 1031 exchange clients also testified that Grimes was not authorized to use the funds in any other way. Charles Bennett, a real estate broker who worked with Grimes and the Millards, also testified that Grimes agreed to put the funds into a separate escrow account and that he was authorized only to use the funds to sell the exchanged property and acquire the target property. Because Grimes failed to place the funds in escrow and improperly used them to make loans and keep some of the money himself, there was sufficient evidence for the jury to find that the agreements did not permit Grimes to use the money as he did. His actions constituted "unauthorized control" and support his theft convictions.

■ Grimes next maintains that he was denied a fair trial because the trial court excluded evidence of certain promissory notes which Grimes asserted were later used to repay loans made with § 1031 funds. Citing *State v.*

---

(Emphasis added.) Because this definition of escrow included all exchanges, a jury could properly find a violation of the escrow statute under the former statute.

*Dorman*,[19] the trial court granted the State's motion in limine to exclude evidence of repayment because repayment is not a defense to theft by embezzlement or deception. Grimes argues that the court's reliance on *Dorman* "effectively presumes guilt in advance of presentation of the defense" because he asserts he had the right to use and invest the § 1031 funds. The trial court allowed evidence that illustrated Grimes' intent at the time of the thefts, but excluded evidence of later repayment or offers of repayment after the charging period.

Grimes' arguments about the propriety of the motion in limine are incorrect because intent to permanently deprive simply is not an element of the crime of theft by embezzlement or by deception. In *State v. Komok*, the Supreme Court concluded that the theft statute, RCW 9A.56.020, does not require an intent to *permanently* deprive.[20] In *State v. Ager*, they stated that "an intent to permanently deprive the account's owner was not a necessary element of the crime of embezzlement and therefore an intent to repay was not relevant."[21] In *State v. Dorman*, we noted that " '[t]he intention to return the money embezzled, or even the actual restitution, does not absolve the guilty party.' "[22] Because the crime is completed at the time of conversion[23] and evidence of repayment or intent of repayment is irrelevant, we conclude that the trial court properly excluded the repayment evidence.

The remainder of this opinion has no precedential value. Therefore, it will not be published but has been filed for public record.[24]

---

[19] 30 Wn. App. 351, 633 P.2d 1340, *review denied*, 96 Wn.2d 1019 (1981).

[20] 113 Wn.2d 810, 816-17, 783 P.2d 1061 (1989).

[21] 128 Wn.2d 85, 94, 904 P.2d 715 (1995) (citing *State v. Moreau*, 35 Wn. App. 688, 690-91, 669 P.2d 483 (1983), *review denied*, 102 Wn.2d 1019 (1984)).

[22] 30 Wn. App. at 355 (quoting *State v. Larson*, 123 Wash. 21, 35, 211 P. 885, 216 P. 28 (1923)).

[23] *Id.*

[24] *See* RCW 2.06.040; CAR 14.

Affirmed.

GROSSE and COX, JJ., concur.

Reconsideration denied April 29, 2002.

Review denied at 148 Wn.2d 1002 (2003).