**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80848-6-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| HELGA KAHR, | ) | |
| | ) | UNPUBLISHED OPINION |
| Appellant. | ) | |
| | ) | |

MANN, C.J. — Helga Kahr was convicted of one count of theft in the first degree and one count of theft in the second degree for using funds of her ward, Jeffrey Barrett, to satisfy her home mortgage. Kahr appeals and argues: (1) that there was insufficient evidence to prove her guilt, (2) that the trial court erred in excluding evidence of her repayment of the Barrett's funds, and (3) that the trial court erred in allowing Barrett to testify despite a prior finding of incompetency. We disagree on all grounds and affirm.

## FACTS

On October 11, 1995, a drunk driver crossed the center line of the road and hit Barrett head on. Barrett suffered a traumatic brain injury and spent several months in a coma prior to moving into a rehabilitation facility. After regaining consciousness, Barrett had to re-learn how to speak, walk, and use the bathroom. He was also unable to

recognize his wife and children. Barrett eventually moved in with his parents where he became under their care.

On April 22, 1997, the Snohomish County Superior Court appointed Barrett's oldest brother, John Jr.[1] Barrett, as limited guardian of person and estate. John Jr. hired Kahr to represent Barrett in his marriage dissolution and in a civil suit to recover damages for his injuries. After lengthy litigation, including a successful appeal to the Washington Supreme Court, Kahr recovered a nearly one million dollar settlement against the bar that overserved the driver that struck Barrett. See Barrett v. Lucky Seven Saloon, Inc., 152 Wn.2d 259, 96 P.3d 386 (2004). Due to Barrett's disability, the family hoped to keep his living expenses low so that he could sustain himself off of the settlement for as long as possible before relying on public assistance.

In 2014, due to increased work responsibilities, John Jr. became unable to continue being Barrett's guardian. As a result, John Jr. asked Kahr if she would assume his role of guardianship, to which she agreed. The Snohomish County Superior Court appointed Kahr as Barrett's guardian in October 2014. At the time of Kahr's appointment, Barrett continued to live with his mother; his father had passed away earlier that year.

Unbeknownst to Barrett and his family, Kahr was having financial troubles. Between 2009 and 2012, Kahr had only made one mortgage payment on her Seattle home. Kahr hired an attorney to mediate foreclosure on her home and secure a loan modification. Still, Kahr could not afford payments.

---

[1] We refer to Jeffery Barrett's brother by his first name for clarity purposes and intend no disrespect in doing so.

-2-

In 2015, Barrett had $657,451.89 between two bank accounts. Both accounts were blocked and required court authorization for Kahr to spend more than $3,000. Citing the cumbersome nature of dealing with the blocked accounts, the "pathetic" interest earned on the accounts, and the inconvenience of traveling to Snohomish County to request spending permission, Kahr moved to unblock Barrett's funds. In her motion, Kahr stated that she had been "consulting with financial planners and investment advisors and [believed Barrett] would be best served by diversifying his assets into liquid savings and other investment vehicles, e.g., a stock index fund, mutual fund, bonds, etc." The court unblocked Barrett's funds for investment, requiring that, in addition to Kahr's annual financial reporting requirements, she file a quarterly financial update during any period "in which more than 10% of the guardianship assets have been allocated to a specific investment."

In January 2016, Barrett's mother's health worsened. The family moved her into an assisted living facility. On January 6, 2016, after exploring alternatives, Barrett moved into the basement of Kahr's home. Beginning in May 2016, Kahr failed to file the required period status reports for Barrett's guardianship.

During this time, Kahr remained unable to pay her mortgage, receiving pre-foreclosure notices from the company managing her loan, Select Portfolio Servicing, Inc. (SPS). SPS scheduled a foreclosure auction date for September 9, 2016. On August 31, 2016, Kahr requested a payoff quote and money-wiring information from SPS. On September 7, 2016, Kahr promised SPS she would pay her loan in full by the following day.

On September 3, 2016, Kahr authorized a wire transfer of $280,673.50 from Barrett's account to SPS. On September 7, 2016, Kahr transferred $2,002.40 for additional fees. These transfers satisfied the entirety of Kahr's mortgage and SPS cancelled the foreclosure auction the day before it was scheduled. Kahr did not inform the court or any of Barrett's family members of the wire transfers.

In August 2017, the court assigned Tom Deacon, a volunteer with Snohomish County's Guardianship Monitoring Program, to follow up on Kahr's report delinquency from the prior year. On August 17, 2017, Kahr filed the reports in response to Deacon's request. Of the 24-page submission, a single line reported a $282,673.90 expenditure labeled "Interest in Real Estate Investment Trust" (REIT). In response to a question on the report "have you (the Guardian) used the incapacitated person's property, had financial dealings with the ward or obtained any benefit from the ward during the period covered by this report?" Kahr answered: "Yes, while living in and occupying the ground floor of [Kahr]'s house, [Barrett] paid rent of $412.50, an amount less than half the market value of the space."

After attempted phone calls, Deacon e-mailed Kahr asking if she had provided any documentation to the court related to the "withdraw of significant funds" from Barrett's accounts. Kahr responded:

> Some of [Barrett]'s cash assets have been invested in a Seattle-based real estate investment trust to allow the guardianship estate to benefit from the appreciating Norwest real estate market without having the responsibility of property maintenance. That investment has been doing well. I do not have the entire file in front of me at the moment, some of it is with the accountant for review. The information on the REIT should be of record in the court file; if for some reason it has not made it to the court file, I will see that it gets filed.

Deacon could not locate any documentation regarding the REIT.

Deacon escalated the use of Barrett's funds to a program manager and requested that the court appoint a guardian ad litem (GAL) to further investigate the guardianship. Kahr objected, asserting that appointing a GAL would be costly to Barrett's estate. The court nonetheless appointed Paul Gill as the GAL to investigate.

Gill requested that Kahr provide REIT documentation, to which she responded that she was caring for an ill relative in Oregon, but that she would respond by September 14, 2016. The deadline passed and Gill moved that the court authorize further investigation into Barrett's guardianship.

On November 1, 2017, Kahr filed a response to Gill's motion, asking that the court deny his request for investigation. Kahr explained that Barrett did not want an investigation and that, due to much effort on her part, Barrett still had resources and independence. In her answer, Kahr did not mention the funds that she wired to satisfy her mortgage.

The court granted Gill's motion, after which Gill wrote to Kahr requesting copies of Barrett's bank records and "full particulars with respect to the 'Interest in Real Estate Investment Trust.'" Shortly thereafter, Kahr retained attorney Sarah Atwood. Atwood informed Gill that she and Kahr were not willing to speak to him. On December 1, 2017, Atwood notified Gill that Kahr would be resigning as Barrett's guardian effective December 31, 2017. As a result, the court ordered Kahr to provide Gill with Barrett's guardianship records by December 31, 2017; Kahr provided the records two weeks late.

On January 19, 2018, the court appointed professional fiduciary Denise Meador as Barrett's new guardian. After reviewing Barrett's bank account records, Meador discovered the wire transfers to SPS. Meador contacted SPS, by which she learned

that Kahr used the transfers to pay her mortgage debt.  Meador examined Kahr's property records and found no indication that Barrett, a trust, or anyone other than Kahr had an interest in the property.  In February 2018, Meador referred the matter to the Seattle Police Department.

On February 8, 2018, after obtaining a $250,000 home equity line of credit, Kahr repaid the funds into Barrett's account, along with the corresponding appreciation amount.

On May 7, 2018,  Atwood sent Meador two letters related to the "Palatine Real Estate Investment Trust."[2]  The letters were dated August 14 and 17, 2016, and addressed from Kahr to Barrett.  The letters describe a real estate investment involving Barrett, Kahr, and Kahr's house, acknowledging potential conflicts of interest.  Barrett would pay $283,000 in exchange for a 40 percent interest in Kahr's home, benefitting from the "very hot" Seattle real estate market.  In return, he would not have to pay rent and Kahr would pay homeowners insurance to safeguard the investment.  The letters further represented that Kahr would establish a REIT, subsequently transferring Barrett's portion of the property to him.  Barrett's name was located on a signature line in the letters.

On June 11, 2018, the State charged Kahr with one count of theft in the first degree for the $280,671.50 transfer and one count of theft in the second degree for the $2,002.40 transfer.

In June of 2019, three months before trial, Kahr sent a check to Barrett's guardianship for $29,740.  She claimed this check was a return on his investment.

---

[2] Kahr's house is located on Palatine Avenue in Seattle.

At trial, Kahr testified that the money wired from Barrett's accounts was a legitimate real estate investment. Although Kahr acknowledged Barrett's cognitive limitations, she stated that she read him the agreement letters over several days, resulting in an understanding and desire to invest in Kahr's home.

The jury convicted Kahr as charged. The court imposed an exceptional sentence based on the jury's findings that Kahr abused a position of trust, that Barrett was a particularly vulnerable victim, and that the count for theft in the first degree was a major economic offense.

Kahr appeals.

## ANALYSIS

### A. Insufficient Evidence

Kahr argues that there was insufficient evidence to prove theft. We disagree.

The State is required to prove every element of a crime beyond a reasonable doubt. State v. Townsend, 147 Wn.2d 666, 679, 57 P.3d 255 (2002). We review the sufficiency of the evidence de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). For a sufficiency of the evidence challenge, a reviewing court "must view the evidence in the light most favorable to the State and decide whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." Townsend, 147 Wn.2d at 666. This court's review of sufficiency of the evidence is highly deferential to the fact finder's decision. State v. Davis, 182 Wn.2d 222, 227, 340 P.3d 820 (2014). We "must also defer to the fact finder on the issue of witness credibility." State v. Witherspoon, 180 Wn.2d 875, 883, 329 P.3d 888 (2014).

A challenge to the sufficiency of the evidence admits the truth of the State's evidence. Witherspoon, 180 Wn.2d 192, 201, 829 P.2d 1068 (1992). We draw all reasonable inferences from the evidence in favor of the State and interpreted most strongly against the defendant. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

The elements of first and second degree theft are identical but for the value of the property.[3] RCW 9A.56.030; RCW 9A.56.040. As charged here, "theft" means "to wrongfully obtain or exert unauthorized control[4] over the property or services of another or the value thereof, with intent to deprive him or her of such property or services." RCW 9A.56.020(1)(a).

A statutory defense to theft is that "the property . . . was appropriated openly and avowedly under a claim of title made in good faith, even though the claim be untenable." RCW 9A.56.020(2)(a). A "good faith claim of title" negates the mens rea of intent because it suggests that the defendant honestly believed she owned the property. State v. Ager, 128 Wn.2d 85, 92, 904 P.2d 715 (1995). Once a defendant produces a factual basis to show good faith, it becomes a question of fact for the jury. State v. Mora, 110 Wn. App. 850, 855, 43 P.3d 38 (2002).

---

[3] An individual commits theft in the first degree when the property taken exceeds $5,000, and theft in the second degree when the property taken exceeds $750 but does not exceed $5,000. RCW 9A.56.030(1)(a); RCW 9A.56.040(1)(a).

[4] "Wrongfully obtains" or "exerts unauthorized control" means:
(a) To take the property or services of another;
(b) Having any property or services in one's possession, custody or control as bailee, factor, lessee, pledgee, renter, servant, attorney, agent, employee, trustee, executor, administrator, guardian, or officer of any person, estate, association, or corporation, or as a public officer, or person authorized by agreement or competent authority to take or hold such possession, custody, or control, to secrete, withhold, or appropriate the same to his or her own use or to the use of any person other than the true owner or person entitled thereto.
RCW 9A.56.010(23)(a), (b).

To support her insufficient evidence argument, Kahr asserts that the investment of Barrett's funds in real estate was not theft because it was authorized by a court order, that the evidence demonstrates that her intent was to invest Barrett's funds to benefit them both (and not to deprive him of said funds), and that the prosecution failed to disprove the defense of a good faith claim of title. Despite Kahr's assertions, there is sufficient evidence to support the jury's findings.

First, although a court order authorized Kahr to make investments on Barrett's behalf, there is sufficient evidence to support the jury's rejection of Kahr using the funds for a legitimate investment. Rather, the jury found that Kahr criminally deprived Barrett of his property. Prior to using Barrett's funds, Kahr did not get her house appraised for fair market value, nor did she investigate potential consequences for Barrett's taxes or government benefits. Kahr also never established the trust that she claimed was part of the investment. There is no evidence on record that Kahr spoke to anyone about placing Barrett's funds into her home; she simply did it. And moreover, despite characterizing the transfer of Barrett's funds as an investment in her home, Kahr never conveyed a property interest to Barrett.

Kahr used Barrett's money in secret. She did not file the quarterly report required for using more than 10 percent of Barrett's funds until prompted by Deacon. Kahr falsely responded to Deacon's inquiries, omitting her use of Barrett's funds to pay off her home, and insisting that there was documentation regarding an REIT on file. Kahr refused to respond to GAL Gill's request, and openly opposed his investigations. In investigation responses, Kahr was silent regarding the use of Barrett's funds to

satisfy her mortgage. Meador was the first to discover this use of funds, and not until after she gained access to Barrett's accounts.

The letters explaining the REIT are also suspect. Kahr did not produce the letters until after police began investigating criminal charges. Kahr did not fulfill promises in the letters such as establishing a trust, recording Barrett's interest in her property, covering rent, or providing homeowners insurance. Viewing these facts in a light most favorable to the State, there is sufficient evidence to support the jury's finding that Kahr did not use Barrett's funds as an investment.

Finally, there is sufficient evidence to support the jury's finding that Kahr did not act in good faith when transferring Barrett's funds. Due to Barrett's brain injury, he was cognitively incapable of managing his finances. Following Barrett's father's passing, his mother's advancing Alzheimer's disease, and his brother John Jr.'s increasing work obligations, few people could provide oversight to Barrett's finances. Kahr further discouraged Barrett's family from being involved in his affairs. These factors combined provided Kahr the opportunity to use Barrett's funds unchecked. Viewing these facts in the light most favorable to the State, there is sufficient evidence to support the jury's finding that Kahr did not act in good faith.

B. Exclusion of Evidence

Kahr argues that by excluding evidence of her repayment of Barrett's funds, the court deprived her of her constitutional right to present a defense.[5] Kahr additionally argues that, during trial, the State "opened the door" to this evidence. We disagree.

---

[5] At oral argument, the State asserted that Kahr raised this issue for the first time on appeal. While appellate courts normally decline to review issues raised for the first time on appeal, RAP 2.5(a) grants them the discretion to accept review of claimed errors not appealed as a matter of right. State v.

1. Initial Exclusion of Evidence

Appellate review of a trial court's exclusion of evidence involves two steps. State v. Clark, 187 Wn.2d 641, 648-49, 389 P.3d 462 (2017). First, we examine whether the trial court abused its discretion when excluding the evidence. We review the trial court's evidentiary rulings for abuse of discretion and defer to those rulings unless no reasonable person would take the view adopted by the trial court." Clark, 187 Wn.2d at 648. Second, when relevant defense evidence was excluded, we "determine as a matter of law whether the exclusion violated the constitutional right to present a defense." Clark, 187 Wn.2d at 648-49.

Whether evidence is relevant is subject to the discretion of the trial court. State v. Rice, 48 Wn. App. 7, 11, 737 P.2d 726 (1987). "The trial judge has broad discretion in balancing the probative value of the evidence against its possible prejudicial impact." Rice, 48 Wn. App. at 1. This court will only reverse a trial court's decision on the relevance and prejudicial effect of the evidence upon a manifest abuse of discretion. State v. Lee, 188 Wn.2d 473, 486, 396 P.3d 316 (2017). Abuse of discretion is "discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." Rice, 48 Wn. App. at 11.

During motions in limine, Kahr asserted that the trial court should admit evidence that she repaid Barrett's funds, as it would be relevant to determine a good faith claim of title and disprove requisite criminal intent. Kahr further requested that the $29,740 check be admitted because it was a return on Barrett's investment. After review, the court excluded evidence of repayment as irrelevant, ruling that theft does not require the

Blazina, 182 Wn.2d 827, 834-35, 344 P.3d 680 (2015). We exercise this discretion to address Kahr's exclusion of evidence argument.

intent to permanently deprive the victim of their funds. The court did, however, allow evidence of the check as a potential return on Barrett's investment.

The trial court did not abuse its discretion in excluding the evidence of repayment. In excluding this evidence, the trial court cited State v. Grimes, 111 Wn. App. 544, 556, 46 P.3d 801 (2002), and its lineage of cases[6] for the proposition that because the crime of embezzlement[7] is committed at the time of conversion, the intent to permanently deprive is not an element.[8] Like Grimes, Kahr's crime was committed at the time of conversion. Thus, "evidence of repayment or intent of repayment is irrelevant." 111 Wn. App. at 556.

Kahr distinguishes these cases, noting that in each the individuals who used funds inappropriately were unauthorized to do so. Here, even were we to believe Kahr's transfer of Barrett's funds was authorized, there is no evidence of the transfer of property in consideration of those funds. Thus, Kahr's use of Barrett's funds to satisfy her mortgage absent any property conveyance is just as invalid as the use of funds in cases relied upon by the trial court. The trial court's reliance on the application of Washington precedent did not rise to an abuse of discretion.

---

[6] The trial court also made reference to State v. Dorman, 30 Wn. App. 351, 633 P.2d 1340 (1981), and State v. Larson, 123 Wash. 21, 211 P. 885 (1923).

[7] Embezzlement is a statutory crime included within Washington's general theft statute. Ch. 9A.56 RCW; State v. Ager, 128 Wn.2d 85, 91, 904 P.2d 715 (1995). "[Embezzlement] differs from the historically common law crime of theft, which requires a trespass in the taking, in that embezzlement occurs where property that is lawfully in the taker's possession is fraudulently or unlawfully appropriated by the taker." Ager, 128 Wn.2d at 91.

[8] Grimes (an escrow officer), was charged with embezzling funds from his clients who authorized him to make real estate transactions on their behalves. Grimes, 111 Wn. App. at 548. Grimes attempted to offer promissory notes as evidence that he repaid the victims, which the trial court excluded. Grimes, 111 Wn. App. at 548. The appellate court affirmed the exclusion, holding that because the crime of embezzlement is committed at the time of conversion, the intent to permanently deprive is not an element. Grimes, 111 Wn. App. at 556.

Even were we to determine that the trial court abused its discretion in excluding evidence of Kahr's repayment, the exclusion did not violate Kahr's constitutional right to present a defense. First, at no point did the State argue that Kahr did not repay Barrett's funds. Second, the trial court permitted Kahr to introduce evidence of profit, thus implying an investment. Finally, in both Kahr's personal testimony and closing argument, she asserted that the transfer of Barrett's funds was authorized, done in good faith, and used for the purposes of investment. Kahr was not denied her right to present a defense.

2. "Open Door" Doctrine

Kahr next argues that the evidence of repayment should have been admitted under the "open door" doctrine. As recently described in State v. Rushworth, 12 Wn. App. 2d 466, 473, 458 P.3d 1192 (2020):

> Put simply, the open door doctrine is a theory of expanded relevance. It permits a court to admit evidence on a topic that would normally be excluded for reasons of policy or undue prejudice when raised by the party who would ordinarily benefit from exclusion. The open door doctrine recognizes that a party can waive protection from a forbidden topic by broaching the subject. Should this happen, the opposing party is entitled to respond. As explained in Gefeller, "when a party opens up a subject of inquiry on direct or cross-examination, [the party] contemplates that the rules will permit cross-examination or redirect examination, as the case may be, within the scope of the examination in which the subject matter was first introduced."

Rushworth, 12 Wn. App. 2d at 473 (quoting State v. Gefeller, 76 Wn.2d 449, 455, 458 P.2d 17 (1969)).

Whether a party has waived protection from a forbidden topic and opened the door to the admission of otherwise inadmissible evidence is within the sound discretion of the trial court. State v. Wafford, 199 Wn. App. 32, 34, 397 P.3d 926 (2017). A

passing reference to a prohibited topic does not open the door. State v. Avendano-Lopez, 79 Wn. App. 706, 715, 904 P.2d 324 (1995).

During trial, Kahr argued three times that the State had "opened the door" to evidence of repayment. During Gill's testimony, after being given an exhibit of faxes to refresh his memory, he commented regarding Kahr's "payoff" of funds. In rejecting Kahr's argument that the State "opened the door," the court noted that it was a close call, "but the fact that it flew right by me and I'm sure it flew by the jury as well—I can't say that of course—but tends to make me think that it's not something that needs to be rebutted or explained because it was so minimal."

The second time Kahr argued that the State "opened the door," the State asked Meador why she needed to assess Barrett's assets after becoming his guardian. Meador testified that she was "concerned about the funds that were missing that couldn't be resolved prior to the guardianship." In rejecting Kahr's argument that the State "opened the door," the court noted that Meador's testimony opened the door to "the fact that the money went to mortgage," not repayment.

The final time Kahr argued that the State opened the door, Atwood was commenting on the transactions that comprised the REIT investment. When the State asked her to elaborate on the transactions, Atwood included "the checks and bank statements for return of funds" in her response. When the State attempted to cut Atwood off and ask what the single most important document for the REIT was, she replied "the wire transfers and the return of the funds." After a sidebar, the court sustained the State's objection and asked the jury to disregard the answer. In rejecting Kahr's argument that the State "opened the door," the court stated that Atwood violated

-14-

motions in limine twice, and her knowledge as a lawyer in doing so bordered on bad faith; Atwood's attempts to undercut the court's rulings did not open the door.

Here, the trial court did not abuse its discretion in concluding that the State did not "open the door" to the evidence of repayment. The testimonies of Gill, Meador, and Atwood were vague and subtle. The court appropriately determined that they did not open the door to Kahr's repayment.

### C. Competency

Kahr argues that the trial court erred in ruling that Barrett was competent to testify. We disagree.

All adult witnesses are presumed competent to testify. State v. Johnston, 143 Wn. App. 1, 13, 177 P.3d 1127 (2007). A witness, however, is not competent to testify if he or she is of "unsound mind" or appears incapable of receiving facts or relating them truthfully. RCW 5.60.020; CrR 6.12. A person is of "unsound mind" if he or she displays a "total lack of comprehension or the inability to distinguish from right or wrong." State v. Smith, 97 Wn.2d 801, 803, 650 P.2d 201 (1982). A person is not of "unsound mind" because of mere cognitive limitations. Johnston, 143 Wn. App. at 14.

"We afford significant deference to the trial judge's competency determination, and we may disturb such a ruling only upon finding a manifest abuse of discretion." State v. Brousseau, 172 Wn.2d 331, 340, 259 P.3d 209 (2011). An appellate court gives the trial judge great deference because the judge "sees the witness, notices his manner, and considers his capacity and intelligence." State v. Cross, 156 Wn. App. 568, 579, 234 P.3d 288 (2010).

Both parties moved in pretrial for the court to determine whether Barrett was competent to testify. To make this determination, the court reviewed video recordings and an interview conducted by investigators regarding Kahr's alleged theft. The court also reviewed a 1997 order that found Barrett "not competent for purposes of deposition" in Barrett's marriage dissolution proceeding, evaluations and opinions of Dr. Monte Scott, and a 2018 occupational assessment of Barrett.

To support her assertion that Barrett was not competent to testify,[9] Kahr cites State v. Smith, 97 Wn.2d 801, 650 P.2d 201 (1982) and State v. Moorison, 43 Wn.2d 23, 259 P.2d 1105 (1953), for the premise that, because Barrett was found incompetent in 1997, the burden shifted to the State to prove present-day competency. After reviewing the documents and videos provided, the trial court found Barrett competent. In doing so, the court stated that the prior findings were made after Barrett's injury and long before Kahr's trial. The court also distinguished Smith and Moorison, because both cases involved shifting the burden of proof following a finding of insanity rather than incompetence.

On appeal, Kahr asserts that the trial court applied the wrong standard when it distinguished the Smith and Moorison opinions based on insanity. Kahr is incorrect. Both Smith[10] and Moorison, explicitly deal with witnesses deemed insane. Thus, Kahr bears the burden of demonstrating that Barrett is incompetent, a burden that she did not meet. Johnston, 143 Wn. App. at 14.

---

[9] Oddly enough, Kahr asserts that Barrett was not competent enough to testify, yet relies on the presumption of his competency to validate the letters that outline the agreement to purchase an ownership interest in Kahr's house.

[10] Smith further clarifies that a witness who is "mentally deficient" (there, a person with an intelligence quotient of 23), is not the same as someone declared insane. 97 Wn.2d at 803.

Affirmed.

Mann, C.J.

WE CONCUR:

Brennan, J.

Chun, J.