[No. 37542-7-II.   Division Two.   February 2, 2010.]

THE STATE OF WASHINGTON, *Respondent*, v. RONALD JAMES CUTHBERT, *Appellant*.

*Lisa E. Tabbut*, for appellant.

*Arthur D. Curtis, Prosecuting Attorney*, and *Michael C. Kinnie, Deputy*, for respondent.

¶1 VAN DEREN, C.J. — Ronald James Cuthbert appeals 16 first degree theft convictions and 1 second degree theft conviction,[1] arguing that the trial court abused its discretion in refusing to (1) authorize public funds for a forensic accountant, violating his right to due process and effective counsel; (2) admit defense testimony about the care his disabled son needs; (3) admit a superior court order entitling him to deposit a check from the Confederated Tribes of the Grand Ronde (Grand Ronde); and (4) instruct the jury on his good faith claim of title defense. He also claims that the evidence was not sufficient to support three of his first degree theft convictions and that cumulative error deprived him of a fair trial. We reverse count 2 (first degree theft) for failure to admit defense evidence relevant to one Grand Ronde check and remand for further proceedings. We affirm Cuthbert's[2] convictions on the remaining counts.

## FACTS

### I. BACKGROUND

¶2 Ryan has lived with severe physical and mental disabilities since birth. Because he cannot care for himself,

---

[1] Former RCW 9A.56.020(1)(a) (1975); former RCW 9A.56.030 (1975); former RCW 9A.56.040 (1975).

[2] Because they share the same last name, for clarity, we refer to the Cuthbert family—Ronald, his wife Deborah, and their sons Ryan and Jason—by their first names. We mean no disrespect.

Ronald and Deborah[3] have provided him full time care at their Vancouver, Washington home.

¶3 In 1983, after the Cuthberts settled a medical malpractice lawsuit relating to Ryan's injuries, the superior court appointed Ronald as guardian of Ryan's person and estate. In addition to monthly malpractice settlement checks, Ryan received disbursements as an enrolled member of the of the Grand Ronde tribe. The order amending order appointing guardian stated the following:

> [A]ny cash money which may be received by the minor shall be placed in an interest bearing account at a bank or savings and loan of the Guardian's choice. The Guardian may make such disbursements from said monies as may be required to provide for the medical and physical needs of the minor.

Ex. 3, at 1. The guardianship order also obligated Ronald to file an accounting with the superior court every three years. When Ryan turned 18, the superior court continued Ryan's guardianship, due to his permanent incapacity, under the terms of the established guardianship.

II. GUARDIANSHIP ACCOUNTING

¶4 Until 1994, when Ryan turned 21, Ronald carefully adhered to the guardianship accounting requirement. But after that time, Ronald felt that the guardianship should pay for what he believed was the true cost of Ryan's full time care. RP at 647-48. Ronald began taking larger reimbursements from the guardianship funds in amounts he considered equal to Ryan's share of the family's monthly food and housing costs.[4] In addition, Ronald began paying himself $2,500 each month as compensation for providing Ryan's care.

¶5 Ronald deposited some of Ryan's monthly malpractice settlement checks directly into his and his wife's personal

---

[3] Ryan was born in 1973.

[4] Ronald charged Ryan one-fourth of the household costs for room and board when Ryan's brother Jason still lived at home and one-third of the household expenses after Jason moved out. Ronald did not seek the superior court's permission to do so.

bank account. At other times, he transferred funds from the guardianship account to their personal account. Although Ronald continued to file the three year guardianship accountings with the superior court, he did not disclose the full amount of money that he allocated to himself or his community.

¶6 During his time as Ryan's guardian, Ronald started an antique business, purchased a Laundromat, and bought rental houses in the towns of Tillamook and Camas. Based on his supposition that Ryan would use one-half of the space, Ronald also built a second story on his home, using $30,000 of guardianship funds to pay for one-half of the addition so they would have "sufficient room to live comfortably." Report of Proceedings (RP) at 651-52. He did not report this use of the guardianship funds to the superior court; nor did he obtain its consent for the expenditure.

¶7 In 1999, Ronald retired from his job as a sales tax auditor for the Washington Department of Revenue. Then, beginning in 2001, when the next accounting was due, Ronald elected not to file the required three year guardianship accountings.

¶8 In 2002, Clark County's guardianship monitoring program discovered that the required 2001 accounting for Ryan's guardianship had not been filed. The monitoring program's manager sent Ronald notice that he had missed the filing deadline. The superior court issued a show cause order compelling Ronald to file the accounting or appear in court. The court also appointed a guardian ad litem to investigate Ryan's welfare and the guardianship estate's status.

¶9 In June 2004, based on the guardian ad litem's investigation and report, the superior court removed Ronald as guardian of Ryan's estate. The court ordered the guardianship firm of Beagle Burke & Associates (BBA) to investigate and to do an accounting of the estate. The Vancouver Police Department also began an investigation of Ronald's use of guardianship funds. On December 30, 2004, after the superior court removed Ronald as Ryan's

guardian in June, Ronald deposited Ryan's Grand Ronde check for $5,770 in his personal checking account.

¶10 The State charged Ronald with 16 counts of first degree theft (counts 1-12, 14-17) and 1 count of second degree theft (count 13). The State filed a bill of particulars clarifying that the charges were divided into three general categories. The first was limited to count 1, wherein the State alleged that, between February 1, 1994, and June 4, 2004, Ronald used a common scheme or plan to deprive Ryan's estate of funds in excess of $200,000. Under the second category—counts 2, 8, and 13—the State alleged that Ronald deposited Ryan's Grand Ronde checks into Ronald's personal account. In the final category—counts 3-7, 9-12, and 14-17—the State alleged that Ronald deposited Ryan's medical malpractice settlement checks into Ronald's personal account. The State also alleged at least one of the following aggravating circumstances for each count: (1) the victim was "particularly vulnerable or incapable of resistance"; (2) Ronald used his "position of trust, confidence, or fiduciary responsibility to facilitate" the crime; and (3) the crime involved a "major economic offense." Clerk's Papers (CP) at 220-28.

III. TRIAL

¶11 Before trial, Ronald's assigned counsel asked the trial court to authorize public funds for a forensic accountant to review financial records and to assist in preparing his defense.[5] The trial court ruled that an accountant was unnecessary but offered to appoint an investigator, which counsel refused.

¶12 At trial, Jeff Nichols, formerly of the Vancouver Police Department, testified that he had interviewed Ronald after receiving a complaint that Ronald was misusing guardianship funds. According to Nichols, Ronald did not feel that he needed the trial court's permission to determine how he spent Ryan's guardianship money be-

---

[5] The record does not reveal how Cuthbert qualified for indigent defense.

cause it involved his family's affairs. Ronald said that, although he previously submitted requests to the superior court to spend money on his son, he "just had stopped doing that" and decided himself what expenditures were appropriate. RP at 492. Gary Beagle, principal of BBA, also testified that his firm conducted a forensic accounting of Ryan's guardianship account and Ronald's personal and business accounts, based on all the available financial records.

¶13 The trial court granted the State's motion in limine to exclude testimony by Niki Tucker, a social worker who had prepared a report detailing the care that Ryan required in 2006 and estimating its cost. The trial court also refused to admit a superior court order that the defense argued authorized Ronald to deposit one of Ryan's Grand Ronde checks into Ronald's personal account.

¶14 Ronald testified that he purchased his businesses and rental houses without using guardianship funds because he used money he had earned by providing services to Ryan or the guardianship. He admitted that he did not seek the trial court's permission to charge Ryan for room and board, "I did not want the court involved in my household. I know what it's like when the petty bureaucrats start to micro-manage a family. It just doesn't work well." RP at 650. But he said that he only spent guardianship funds "[t]o reimburse [himself and his wife] for the actual cost of raising [Ryan] plus the costs that are for the work of actually taking care of him." RP at 650-51. Ronald concluded, "When it all works out in the wash, we took a very reasonable amount." RP at 654.

¶15 Defense counsel unsuccessfully proposed a "good faith claim of title" jury instruction in order to argue a statutory defense to theft. RP at 773. The jury convicted Ronald as charged and returned verdicts finding all of the aggravating factors.

¶16 Ronald appeals.

## ANALYSIS

### I. APPOINTMENT OF EXPERT FORENSIC ACCOUNTANT AT PUBLIC EXPENSE

¶17 Ronald first argues that the trial court abused its discretion by refusing, under CrR 3.1(f),[6] to authorize public funds for a forensic accountant, thus denying him due process and effective assistance of counsel. The State contends that, under the facts of this case, such an expert was unnecessary and that the trial court properly offered to authorize money for a defense investigator. We agree with the State.

### A. Standard of Review

■ ¶18 "Whether expert services are necessary for an indigent defendant's adequate defense is within the discretion of the trial court and its decision will not be overturned absent an abuse of discretion." *State v. French*, 157 Wn.2d 593, 607, 141 P.3d 54 (2006). A trial court abuses its discretion when its ruling is manifestly unreasonable or based on untenable grounds. *State v. Mee Hui Kim*, 134 Wn. App. 27, 41-42, 139 P.3d 354 (2006).

### B. Pretrial Hearings

¶19 Ronald's counsel asked for the appointment of a forensic accountant to assist in reviewing the discovery and in preparing Ronald's defense. He told the trial court, "There's still -- well, discovery is still 4,000 pages. I'm still wading through it and through other things. The forensic accountant may help, but I still have a need to do that." RP at 22. Noting that such a professional would cost roughly

---

[6] CrR 3.1(f) provides, in part:

> (1) A lawyer for a defendant who is financially unable to obtain investigative, expert, or other services necessary to an adequate defense in the case may request them by a motion to the court.
>
> (2) Upon finding the services are necessary and that the defendant is financially unable to obtain them, the court . . . shall authorize the services.

$15,000, he argued, "It may lead me nowhere, but it may not." RP at 45.

> [DEFENSE COUNSEL]: . . . [M]y defense is, which is something to the effect that -- or is to the effect that it's a substance over form argument that if the defendant took the money in violation or not in conformity with the guardianship act, it went to the child's benefit anyway.
>
> And, as you may recall, I filed a memorandum on equitable defenses and -- and their use in court --
>
> . . . .
>
> THE COURT: I do.
>
> [DEFENSE COUNSEL]: -- and you said, Well, maybe not, and probably not, but, you know, I at least got to take a shot -- I can take a shot at it.
>
> So that's where the use of these experts come[s] in, to assist in that formulation.
>
> THE COURT: Okay, well, I guess -- of course, I don't see the discovery, so I may ask questions that are obvious to both counsel, but is the discovery that we're talking about that [BBA] or whoever went back and looked at bank records and said that this amount of money went in, and these checks went out?
>
> [DEFENSE COUNSEL]: Through several different accounting departments, bank accounts.
>
> THE COURT: I guess I'm not clear why -- what is it about that that's so complicated that I would need to appoint an expert to -- I mean, either -- either the money went out by a particular check or method or it didn't.

RP at 46-47.

¶20 The State explained that the BBA firm discovered irregularities when investigating the guardianship accounting and took over the guardianship's financial management. The firm did not use accountants; instead, it reconstructed the guardianship financial records using Quicken, a common software program for personal and small business bookkeeping. While the State objected to any duplication of BBA's work, the State nevertheless

admitted that "tracing money though a number of accounts I've found myself to be pretty confusing." RP at 49.

¶21 When the trial court asked Ronald's counsel whether an investigator would suffice, counsel stated, "You need somebody who is used to working with these records. And that's somebody who works with them regularly, a forensic accountant, what do you want to -- the term you want to use, a forensic investigator/accountant." RP at 53.

¶22 The trial court then had the following discussion with counsel:

> THE COURT: Well, I guess that's -- I'm still not understanding why that -- let's say -- let's say that, for example, on Count Four, it says here that on April 15th, 2004, [Ronald]'s charged with taking more than $1500 from Ryan Cuthbert on a specific day.
>
> I assume that -- I'm just assuming, because I haven't seen all this, that they're saying, well, we put all this data in the Quicken program and it shows that on April 15th somebody made a withdrawal from x bank account that was more than $1500 and it went here.
>
> What -- why is it difficult to figure out whether or not that entry is right or not? That's -- I guess that's what I'm -- if -- if it's we put in here some bank deposits and some bank withdrawals, checks and those sorts of things, and all that data is available to you, I assume they'd probably say something like, Well, check No. 3326 for $1600 went out on April 15th, 2004.
>
> So you look at check No. 3326 to see whether it's for $1600. So I don't --
>
> [DEFENSE COUNSEL]: And where it went can be important to the defendant's case if it just went to -- to Ryan's benefit.
>
> THE COURT: Well, if it says cash, let's say you get all the forensic accountants in here you want, if they see that check and it's there, $1600 in cash, how are they going to tell you where it went?
>
> [DEFENSE COUNSEL]: Well, if you had a contemporaneous account deposit in the household business account that they use for the, you know, health and welfare of Ryan, then they -- of $1600, then, yeah, that would be a linkup.

THE COURT: Well, I understand your argument. I'm not -- I'm not convinced that the services of a forensic accountant are necessary to assist the Defense based on the evidence that I've -- or the information that I've received so far.

So I'm --

[DEFENSE COUNSEL]: Well, the -- also --

THE COURT: -- denying your request --

[DEFENSE COUNSEL]: -- it keeps leaving the -- I think I should bring all the paperwork in for you to look at the 4,000 pages and say, well, what am I supposed to do with this, Your Honor? How am I supposed to figure out how -- what -- what goes in and what goes out? That may have to be the next motion.

THE COURT: I appreciate your difficulty, counsel, but the problem is that anyone who wants an expert at public expense is supposed to make a preliminary showing that it's necessary, and it's not good enough to come in and say it might lead to something good. That's what it requires, a finding by the Court that the services you're requesting are necessary.

[DEFENSE COUNSEL]: Well, I've --

THE COURT: And I can't find it based on what you're telling me, that you want to have it because it might lead to something good.

RP at 55-57. Following this exchange, the trial court authorized an initial $1,000 for an investigator to help defense counsel. But counsel said that no investigators would agree to check all the records against BBA's Quicken entries and apparently declined the trial court's offer.

## C. Forensic Accountant Not Necessary to an Adequate Defense

■ ¶23 The Fourteenth Amendment[7] requires that the State provide indigent defendants "with the basic tools of an adequate defense . . . when those tools are available for a price to other prisoners." *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S. Ct. 431, 30 L. Ed. 2d 400 (1971). Such tools

---

[7] U.S. CONST. amend. XIV.

include a "constitutional right to the assistance of an expert as provided for in CrR 3.1."[8] *State v. Heffner*, 126 Wn. App. 803, 809, 110 P.3d 219 (2005); *see also Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985) (plurality opinion); *Ake v. Oklahoma*, 470 U.S. 68, 76, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).

¶24 CrR 3.1(f) governs the appointment of experts at public expense. *State v. Young*, 125 Wn.2d 688, 691, 888 P.2d 142 (1995). "CrR 3.1(f) incorporates the constitutional right of an indigent defendant to the assistance of expert witnesses." *State v. Poulsen*, 45 Wn. App. 706, 709, 726 P.2d 1036 (1986) (footnote omitted). In *Ake*, the United States Supreme Court recognized the possibility that a defendant's particular request for expert assistance might be necessary to preserve fundamental fairness.[9] 470 U.S. at 77. The Court held that the Fourteenth Amendment requires the State to provide access to a psychiatrist when the

---

[8] The precise constitutional grounding of this right is less clear. Several federal appellate circuits have concluded that this right to publicly funded expert assistance stems from a defendant's (1) Fifth Amendment right to due process, (2) Fourteenth Amendment right to due process, (3) Fourteenth Amendment right to equal protection, (4) Sixth Amendment right to effective counsel, or (5) right to some combination thereof. *See, e.g., Castro v. Ward*, 138 F.3d 810, 826 (10th Cir. 1998) (Fourteenth Amendment due process clause); *United States v. Kennedy*, 64 F.3d 1465, 1473 (10th Cir. 1995) (Fifth Amendment due process clause); *Moore v. Kemp*, 809 F.2d 702, 709 (11th Cir. 1987) (Fourteenth Amendment due process clause); *Williams v. Martin*, 618 F.2d 1021, 1027 (4th Cir. 1980) (Sixth Amendment, Fourteenth Amendment due process and equal protection clauses); *Hoback v. Alabama*, 607 F.2d 680, 682-83 (5th Cir. 1979) (Sixth Amendment, Fourteenth Amendment due process clause); *Mason v. Arizona*, 504 F.2d 1345, 1351 (9th Cir. 1974) (Sixth Amendment); *Lee v. Habib*, 137 U.S. App. D.C. 403, 424 F.2d 891, 899 (1970) (Fourteenth Amendment equal protection clause); *United States ex rel. Edney v. Smith*, 425 F. Supp. 1038, 1048 (E.D.N.Y. 1976) (Sixth Amendment), *aff'd*, 556 F.2d 556 (2d Cir. 1977); *see generally* JOSEPH G. COOK, CONSTITUTIONAL RIGHTS OF THE ACCUSED § 24:3 (3d ed. 1996); Paul C. Giannelli, Ake v. Oklahoma: *The Right to Expert Assistance in a Post*-Daubert, *Post-DNA World*, 89 CORNELL L. REV. 1305 (2003-2004); Ruby B. Weeks, Annotation, *Right of Indigent Defendant in Criminal Case to Aid of State by Appointment of Investigator or Expert*, 34 A.L.R.3D 1256 (1970). Washington courts have also found this right in various constitutional principles. *See, e.g., State v. Punsalan*, 156 Wn.2d 875, 878, 133 P.3d 934 (2006) (Sixth Amendment); *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 326, 868 P.2d 835 (1994) (Sixth Amendment); *State v. Poulsen*, 45 Wn. App. 706, 709, 726 P.2d 1036 (1986) (Fourteenth Amendment due process clause).

[9] Citing the due process balancing test from *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), the *Ake* Court chose to consider three factors to evaluate such constitutional challenges:

accused has "made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial." *Ake*, 470 U.S. at 74, 76-77.

¶25 In *Caldwell*, the United States Supreme Court briefly considered the defendant's unsuccessful request for the aid of a criminal investigator, fingerprint expert, and ballistics expert. 472 U.S. at 323 n.1. Citing *Ake*, the Court summarily rejected Caldwell's due process argument because he failed to develop his bare claim that the publicly funded experts would have been beneficial to his defense. Accordingly, the Court implied that refusal to provide nonpsychiatric expert assistance could deny the defendant a fair trial. *Caldwell*, 472 U.S. at 323 n.1. And in *Poulsen*—a Washington case where a defendant was denied publicly funded access to a psychologist to establish a diminished capacity defense—our court "interpret[ed] *Ake* and CrR 3.1(f) to require the safeguarding of the rights of indigent defendants whose 'mental condition' is likely to be a significant factor at trial." 45 Wn. App. at 710.

¶26 The parties have not cited, nor can we find, any Washington case addressing the necessity of appointing a forensic accountant to aid in defending a theft charge.[10] But *Washington Practice* recognizes this possibility, "particularly in complicated or lengthy criminal proceedings." 12 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 2005, at 439 (3d ed. 2004).

¶27 Federal and other state courts have considered whether their statutes required the appointment of expert

---

The first is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.

470 U.S. at 77.

Here, neither party uses the *Ake* test to analyze this issue. We thus conclude that, in substance, Ronald challenges the trial court's ruling under CrR 3.1(f) and not on constitutional grounds.

[10] For support, Ronald cites two Washington cases involving defense requests for the appointment of psychologists but wholly fails to compare them to the instant facts. This line of argument is unpersuasive.

accountants to aid criminal defendants. *See, e.g., United States v. Kennedy*, 64 F.3d 1465, 1473 (10th Cir. 1995); *People v. Lueth*, 253 Mich. App. 670, 688-89, 660 N.W.2d 322 (2002). Washington's CrR 3.1(f) neatly tracks the requirement in the federal Criminal Justice Act of 1964, 18 U.S.C. § 3006A, that the government provide "investigative, expert, and other services . . . if necessary for adequate representation." 18 U.S.C. § 3006A(e)(2)(A). And, in Michigan, the statutory standard for appointing experts requires that "the defendant . . . show that he 'cannot safely proceed to a trial' without the proposed witness." *Lueth*, 253 Mich. App. at 688 (quoting MICH. COMP. LAWS § 775.15).

¶28 In *Kennedy*, the federal government charged the defendant with 109 criminal counts, alleging an elaborate Ponzi scheme to defraud investors in precious metals and coins. 64 F.3d at 1468. Although the trial court authorized funds for an investigator and three experts on Kennedy's company's inner workings, the metal industry, and Ponzi schemes, the trial court denied the defendant's request to, among other things, hire the former accounting firm Arthur Andersen to comprehensively audit the company's financial records—consisting of several hundred boxes of documents—and to review the work of the government's expert witnesses. A jury ultimately convicted Kennedy of one count of racketeering, seven counts of money laundering, and nine counts of mail fraud. *Kennedy*, 64 F.3d at 1469.

¶29 On appeal, the Tenth Circuit held that the trial court did not abuse its discretion by denying Kennedy's request for accounting services, under 18 U.S.C. § 3006A, because he did not sufficiently demonstrate why he needed them to adequately prepare his mismanagement defense or challenge the government expert's testimony. *Kennedy*, 64 F.3d at 1470, 1472-73. First, the court noted that Kennedy suggested only that an audit would demonstrate he was not a criminal, without explaining what information he sought. In fact, the information he sought was already available in the company's bankruptcy filings. *Kennedy*, 64 F.3d at 1472. Second, the Tenth Circuit pointed out that the govern-

ment's expert witness was not a certified accountant and that the defense already had three witnesses with relevant expertise. *Kennedy*, 64 F.3d at 1472-73.

¶30 In *Lueth*, the People charged the defendant with larceny by false pretenses of over $100.00, embezzlement by an agent of over $100.00, and horse racing violations. 253 Mich. App. at 674. These charges stemmed from (1) permitting customers of his employer's racetrack to bet on horse racing on credit, (2) falsifying records to show that customers wagered cash, (3) taking cash intended for deposit at his employer's bank and depositing it in his personal bank account, and (4) writing checks back to the racetrack from his personal account. *Lueth*, 253 Mich. App. at 674, 682, 684. At trial, the People introduced evidence that an accountant's audit showed $545,735.78 missing from corporate accounts. *Lueth*, 253 Mich. App. at 682. The trial court ostensibly denied Lueth's request for an expert accountant to help him review the racetrack's financial records. *See Lueth*, 253 Mich. App. at 688-89.

¶31 On appeal, Lueth argued that the trial court erred in this decision. *Lueth*, 253 Mich. App. at 688. But the Michigan Court of Appeals disagreed, concluding that he failed to demonstrate how an expert could have explained the company's audit findings or procedures. *Lueth*, 253 Mich. App. at 689. The court also noted that Lueth delayed his appointment request until a full two months after he had notice of the restitution hearing following conviction. *Lueth*, 253 Mich. App. at 689. The court held that he could not show that he could not have safely proceeded to trial and it affirmed the trial court's decision. *Lueth*, 253 Mich. App. at 689.

¶32 Furthermore, Division Three's decision in *Heffner* is instructive. There, the State charged Heffner with first degree theft while working as a casino dealer, alleging that he purposefully dealt winning cards to generate larger tips for himself. *Heffner*, 126 Wn. App. at 805-06. Before trial, the State prepared spreadsheets and had a statistical expert demonstrate the mathematical improbability that

Heffner could have randomly dealt those cards. *Heffner*, 126 Wn. App. at 807. Without naming an expert or offering an estimate of the costs, Heffner moved for appointment of a publicly funded expert. The trial court denied the defense's motion and allowed the State to add its statistics expert to the list of witnesses. *Heffner*, 126 Wn. App. at 807.

¶33 On appeal, Heffner argued, among other things, that the trial court abused its discretion in denying him an expert. *See Heffner*, 126 Wn. App. at 806. But Division Three affirmed, pointing out that he failed to specify a type of expert, much less why he needed one, and explaining that "[t]he mere fact that the evidence involved arithmetic does not require that an expert present or rebut the calculations." *Heffner*, 126 Wn. App. at 809-10.

■ ¶34 Here, Ronald specifically requested a forensic accountant but we, nevertheless, agree with Division Three that Washington courts will not deem experts to be necessary simply because defense counsel must rebut a prosecution case built on numbers or mathematical evidence. *See Heffner*, 126 Wn. App. at 809-10. Thus, based on CrR 3.1(f) and guidance from the reported cases, we conclude that the trial court is required to appoint a forensic accountant when necessary to address what is "likely to be a significant factor at trial"—that is, when the accused needs assistance on an issue relating to guilt.[11] *Ake*, 470 U.S. at 74.

■ ¶35 Beagle was not an accountant but Ronald, who was free on bond, had a degree in accounting from a business college, had worked as a tax auditor for the State,

[11] In *City of Mount Vernon v. Cochran*, a case involving whether the defendant, charged with driving while under the influence, had a right to the publicly funded assistance of a breathalyzer machine expert, Division One approvingly quoted the following version of this test:

> One [North Carolina] court has held the "significant factor at trial" test is satisfied "when an indigent defendant makes a particularized showing that (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it would materially assist him in the preparation of his case."

70 Wn. App. 517, 524, 855 P.2d 1180 (1993) (internal quotation marks omitted) (quoting *State v. Parks*, 331 N.C. 649, 656, 417 S.E.2d 467 (1992)).

and could have assisted in his own defense by applying his own knowledge about how the money from the guardianship estate was spent. He could have used the BBA report, which identified cash and other money movements from, between, and among accounts that Ronald established, as a summary, pointing to the State's basis for the various charges.[12] Ronald should have—and very well may have—helped his attorney probe the State's evidence from BBA for weakness or determine the end point of any questionable withdrawals or deposits to show that Ryan actually received their benefit. The trial court offered to authorize funds for the defense to hire someone to check all the records against Beagle's Quicken entries but Ronald's counsel declined that offer.

¶36 Like Lueth, Ronald falsified records and used Ryan's money in diverting funds into his personal accounts. While Ronald requested an accountant at a different trial stage than Lueth—during trial preparation instead of for postconviction restitution hearings—both sought help in reviewing dense financial records. The Michigan appellate court faulted Lueth for making a delayed request, but it nevertheless held that he failed to demonstrate a sufficient need for an expert accountant at the public's expense. *Lueth*, 253 Mich. App. at 689. And, like Kennedy, Ronald already had the information from his own receipt of the funds and BBA's summary about the money at issue. *See Kennedy*, 64 F.3d at 1472. Ronald's claim similarly fails.

¶37 From our own review of the record, Ronald's counsel performed adequately by challenging Beagle's explanation of evidence and arguing that BBA's fees created a bias in favor of the State. Counsel also elicited that Beagle was not an accountant or forensic scientist and that Ronald did not direct any guardianship funds to Swiss bank accounts or French chateaus.

---

[12] To create documents showing the activity in various accounts, Beagle and his staff merely entered the financial records into a Quicken bookkeeping system and used that data to create, in essence, an account register for each of the accounts at issue in this case.

¶38 Ronald was in the best position to counter the argument that the identified transactions were for his personal benefit rather than for Ryan's. As a court-appointed guardian, he knew or should have known where all of Ryan's money was spent or deposited. Furthermore, BBA's creation of account ledgers identified and focused on questionable expenditures or withdrawals, thus pinpointing what Ronald needed to offer by way of testimony or financial records to show how the questioned money was spent. Thus, we hold that the trial court did not abuse its discretion by refusing to provide funds for Ronald to hire a forensic accountant.

## II. EVIDENTIARY ISSUES

¶39 Ronald also claims that the trial court abused its discretion by refusing to admit certain evidence. Specifically, he argues that the trial court should have admitted Tucker's testimony regarding the care that Ryan needed and the cost of that care. He also contends that the trial court should have admitted a guardianship order allowing Ronald to keep funds from a deposited Grand Ronde check (forming the basis of count 2) to offset guardianship funds owed him from BBA. We hold that excluding Tucker's testimony was not an abuse of discretion but that excluding the guardianship order authorizing Ronald to keep the funds from the specific Grand Ronde check constituted an abuse of discretion and was not harmless error.

### A. Standard of Review

■ ¶40 "A defendant in a criminal case has a constitutional right to present a defense consisting of relevant evidence that is not otherwise inadmissible." *State v. Rehak*, 67 Wn. App. 157, 162, 834 P.2d 651 (1992). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence . . . more probable or less probable than it would be without the evidence." ER 401. "The threshold to admit relevant evidence is very low. Even minimally relevant evidence is admissible." *State v.*

*Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). The trial court has broad discretion to admit or exclude trial evidence and we will not reverse such action absent an abuse of discretion. *Mee Hui Kim*, 134 Wn. App. at 41.

## B. Challenged Evidentiary Rulings

### 1. Tucker's Testimony

¶41 Before trial, the trial court approved funds for the defense to hire Tucker to prepare a report regarding the extensive care that Ryan needed and how much these services would cost in the private sector. In responding to the State's motion in limine to preclude Tucker's testimony based on her report, the trial court made the following ruling:

> . . . All right, with regard to the last motion in limine I was dealing with, I read Ms. Tucker's report. I'd note that prior testimony indicates that [Ronald] was removed as guardian in the middle of 2004. Ms. [Tucker]'s report relates to her study in September 2006 related to various costs of care options for Ryan Cuthbert.
>
> In reviewing that report, it does not appear to contain any relevant testimony to these proceedings, so I'll grant the motion.

RP at 361. The trial court agreed to allow an offer of proof from Tucker. Later, after Ronald testified, the trial court again asked his defense counsel if he wished to present an offer of proof about Tucker's testimony. Counsel decided to rest on the substance of her report and the trial court did not change its prior ruling excluding the evidence as irrelevant.

¶42 Here, the State charged Ronald with multiple counts of first and second degree theft occurring before 2005. The facts "of consequence" are the elements of theft, namely, that Ronald "wrongfully obtain[ed] or exert[ed] unauthorized control over the property . . . of [Ryan] or the value thereof, with intent to deprive him of such property"

before 2005. Former RCW 9A.56.020(1)(a) (1975). At trial, Ronald essentially argued that he did not have the requisite intent to deprive Ryan of his funds. We give the word "deprive" its common meaning: "to take away" or "to take something away from." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 606 (2002); *see State v. Miller*, 92 Wn. App. 693, 705-06, 964 P.2d 1196 (1998).

■ ¶43 Tucker's testimony that Ryan required round-the-clock care in 2006 had no bearing on whether Ronald exerted unauthorized control over guardianship funds or whether he intended to wrongfully take money from Ryan's estate between 1994 and 2004. Therefore, we hold that the trial court did not abuse its discretion by refusing to admit Tucker's testimony.

2. Court Order Authorizing Monetary Offset to Ronald

■ ¶44 During trial, Ronald's counsel had the opportunity to review Ryan's civil guardianship file and found a superior court order entered February 4, 2005, containing the following language:

> [BBA] will pay [Ronald] $1500 per month for Ryan's care and living expenses commencing June 10, 2004 less the $5770.00 check received by [Ronald] from the Grand Ronde, together with additional reasonable expenses incurred by him on Ryan's behalf if receipts are provided to BBA, and any medical expenses paid for by [Ronald].

Ex. 48, at 3-4.

¶45 Upon finding this order, Ronald's counsel moved for dismissal of count 2 "because the order implicitly if not expressly authorized [Ronald] to have the Grand Ronde money as an offset." RP at 664. But the trial court disagreed:

> Well, the order appears to have no relevance, and I would deny the request to dismiss based on the order.
>
> It's true that if the court had made an express or implicit finding that [Ronald] was entitled to take the money out in December 2004 from the Grand Ronde tribe, then there may be questions of judicial estoppel.

However, the order does not indicate either of those things. The fact that he's being -- it's an offset against living expenses in fact appears to imply that he had no authority to take the money and that he has to repay it back by forgoing certain benefits to which he would otherwise be entitled.

And . . . a person's civil liability is not the same thing as his criminal liability, and so whether or not he was civilly liable to take an offset or not is not relevant to the question of whether he's criminally liable for having taken the money in the first place.

So your motion to dismiss is denied, and to the extent that the order is being offered, it seems to have no relevance in this proceeding.

RP at 664-65.

¶46 Unlike Tucker's testimony, the superior court order was indeed relevant to Ronald's defense, specifically count 2. According to the State's bill of particulars, count 2 consisted of the following:

The State alleges that in May, 2004 [Ronald], acting as Guardian for Ryan Cuthbert, applied for a distribution of benefit funds from the Grand Ronde tribe. The State further alleges that on or about December 30, 2004, after having been removed as Guardian for Ryan Cuthbert, [Ronald] obtained the distribution check, which was payable to Ryan J. Cuthbert in the amount of $5,770.00, and deposited into his personal account # 9299 at U.S. Bank, and thereafter converted the funds to his own use.

CP at 62-63. The disputed guardianship order directed BBA to pay Ronald certain guardianship funds, less Ryan's $5,770 Grand Ronde check, to offset BBA's tardy payments for Ryan's expenses that Ronald had already paid.

¶47 Ronald's defense was twofold. First, he maintained that he did not exercise unauthorized control of guardianship funds. Second, he argued that he did not convert the funds to his own use; rather, he used all the money for Ryan's needs.

¶48 Ronald's testimony reflected his understanding that the superior court had repeatedly authorized him to use the

check as an offset before he deposited it on December 30, 2004:

[RONALD:] . . . Then I eventually deposited [the 2004 Grand Ronde check] in my account.

[DEFENSE COUNSEL:] Okay. And why did you do that?

[RONALD:] Because in the middle of October, around the 10th -- well, somewhere around the 14th to 18th of October, we were in Judge Poyfair's courtroom and Judge Poyfair gave a verbal instruction from the bench that Gary Beagle was to furnish [Ronald's civil counsel] with a copy of a personal services contract so they could begin paying Ryan's support.

Ryan -- or [Ronald's civil counsel] never received that.

Then on December 17th we were in front of Judge Wulle, and Judge Wulle again said, I don't care what you think happened to the money in the past, that money is to take care of Ryan's immediate needs and you will do that.

[DEFENSE COUNSEL:] Well --

[RONALD:] So there were two court orders, and I had already paid $1600 for an attorney to represent me in those two, and nothing had happened.

[DEFENSE COUNSEL:] Well, these orders you're talking about, were they orders to -- for you to be paid for being caregiver?

[RONALD:] Yes.

[DEFENSE COUNSEL:] Okay. And -- and you hadn't been paid.

[RONALD:] No.

. . . .

[DEFENSE COUNSEL:] Did you place the money in your account as compensation for money you hadn't received yet?

[RONALD:] Yes.

[DEFENSE COUNSEL:] Based on those orders or --

[RONALD:] Based on --

[DEFENSE COUNSEL:] -- directions of the court?

[RONALD:] -- two prior orders.

RP at 701-03. Ronald's credibility was strained at trial, so admission of this court order would have bolstered his

testimony that he had authorization to keep the funds from Ryan's Grand Ronde check in the amount of $5,770 as an offset for the funds due him for providing Ryan's care. We read the superior court order to memorialize these oral rulings.

¶49 The order is clearly relevant to Ronald's defense that he did not have the requisite intent to deprive Ryan's estate of those funds or to use them in a manner that did not benefit Ryan. *See* former RCW 9A.56.020(1)(a). Thus, this evidence is relevant to count 2 and it might have caused the jury to reach a different conclusion on count 2. We hold that its exclusion was an abuse of discretion.

III. JURY INSTRUCTION

¶50 Ronald next claims that the trial court also abused its discretion by failing to give his proposed jury instruction regarding the defense of good faith claim of title because there was sufficient evidence to support it. We disagree.

A. Standard of Review

¶51 "We review the trial court's decision whether to give a particular jury instruction for abuse of discretion." *State v. Chase*, 134 Wn. App. 792, 803, 142 P.3d 630 (2006).

B. Insufficient Evidence that Ronald Took Funds Openly and Avowedly

¶52 A criminal defendant is "entitled to have the trial court instruct upon [his] theory of the case if there is evidence to support the theory." *State v. Hughes*, 106 Wn.2d 176, 191, 721 P.2d 902 (1986). "In evaluating whether the evidence is sufficient to support a jury instruction on an affirmative defense, the court must interpret it most strongly in favor of the defendant and must not weigh the proof or judge the witnesses' credibility, which are exclusive functions of the jury." *State v. May*, 100 Wn. App. 478, 482, 997 P.2d 956 (2000). "A refusal to give a requested jury instruction constitutes reversible error where the absence of the instruction prevents the defendant from presenting

his theory of the case." *State v. Buzzell*, 148 Wn. App. 592, 598, 200 P.3d 287, *review denied*, 166 Wn.2d 1036 (2009).

¶53 Based on 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 19.08, at 319 (3d ed. 2008),[13] Ronald's proposed jury instruction read, "In any prosecution for theft, it shall be a sufficient defense that the property was appropriated openly and avowedly under a claim of title made in good faith, even though the claim be untenable." CP at 215. The trial court questioned whether Ronald presented any evidence to support this defense:

> THE COURT: Okay. So tell me why I should give [th]at instruction. And more specifically, let's forget about the claim of title for a minute and tell me in what circumstance there's evidence to suggest that [Ronald] made these appropriations openly and avowedly.

> [DEFENSE COUNSEL]: That would be the threshold question. Openly in the sense he was not hiding what he did, he did it openly, took it from the money (sic). There's no hidden activity on his part.

> And avowedly, I suppose I'm not sure what that would mean. I guess --

> THE COURT: I thought that his testimony was that he was hiding what he did, that he knew that -- that --

> [DEFENSE COUNSEL]: Oh.

> THE COURT: -- he didn't want bureaucrats being involved in his business and so he deliberately understated the amount that he --

> [DEFENSE COUNSEL]: He did testify to that --

> THE COURT: -- was taking in support.

---

[13] *Washington Pattern Jury Instruction* 19.08 provides:

> It is a defense to a charge of theft that the property or service was appropriated openly and avowedly under a good faith claim of title, even if the claim is untenable.

> The [State] [City] [County] has the burden of proving beyond a reasonable doubt that the defendant did not appropriate the property openly and avowedly under a good faith claim of title. If you find that the [State] [City] [County] has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty [as to this charge].

(Alterations in original.)

[DEFENSE COUNSEL]: -- yes, he did testify to that.

THE COURT: Uh-huh.

[DEFENSE COUNSEL]: But it --

THE COURT: What evidence is there to the contrary, that at some point he openly told somebody, I think I'm entitled to these services and I'm taking them?

[DEFENSE COUNSEL]: I don't know that there's anything in the record that he did tell anybody that, but certainly the record would show that he did transfer the money with no question, it was open record in that sense.

RP at 767-68.

¶54 Ultimately, the trial court denied the request for the instruction:

. . . In this case, the defendant at no time openly and avowedly sought additional fees for services as guardian of the person. And, matter of fact, his testimony and the evidence establishes that he was doing exactly the opposite, he was not openly and avowedly doing things, he was actively concealing from the court that he was taking additional moneys for what he claimed were his services.

Nor did he testify or is there any evidence to suggest that he believed he was legally entitled to do what he was doing. The testimony is the opposite, that he believed that if the court were involved the petty bureaucrats would be involved and that sort of thing, and so therefore he didn't want to run that risk.

So he didn't testify that he thought he was using the proper procedures and it turns out he was wrong, so he hasn't established a legal or equitable title to the property. He hasn't established he did it openly and avowedly. So he's not entitled to claim that defense in this case.

RP at 774-75.

¶55 Here, the record does not show sufficient evidence to support Ronald's requested instruction. Even if we interpret the evidence most strongly in Ronald's favor, there were a series of events in which Ronald deposited or transferred checks payable to his son into his own accounts

without any evidence that he properly accounted for his actions. He submitted false guardianship accountings and ultimately chose to not file the court ordered accountings. He admitted that he wanted to keep the superior court and other "petty bureaucrats" from looking into his family's affairs. RP at 650. Thus, we hold that there was insufficient evidence to support this jury instruction and that the trial court did not abuse its discretion by refusing to give it.

IV. SUFFICIENCY OF EVIDENCE

¶56 Ronald further argues that the evidence was insufficient to support his convictions for stealing Ryan's Grand Ronde checks—counts 8 and 13[14]—because the State did not present evidence demonstrating any legal restrictions on where he could deposit or how he could spend those checks. We disagree.

A. Standard of Review

¶57 When reviewing a challenge to the sufficiency of the evidence, we determine whether any rational fact finder could have found the essential elements of the charged crime beyond a reasonable doubt, viewing the trial evidence in the light most favorable to the State. *State v. Brockob*, 159 Wn.2d 311, 336, 150 P.3d 59 (2006). An insufficiency claim also admits all inferences that a fact finder can reasonably draw from the evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We treat direct and circumstantial evidence as equally reliable and we defer to the trier of fact on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980); *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992).

B. Unauthorized Control over Grand Ronde Checks

¶58 The State charged Ronald with multiple counts of theft or "wrongfully obtain[ing] or exert[ing] unauthorized

---

[14] We do not address Ronald's similar challenge to count two since we reverse the conviction on count two for other reasons.

control over the property . . . of [Ryan] or the value thereof, with intent to deprive him of such property." Former RCW 9A.56.020(1)(a). Ronald's order amending order appointing guardian directed that "any cash money which may be received by the minor shall be placed in an interest bearing account at a bank or savings and loan." Ex. 3, at 1. Therefore, Ronald had to deposit "any" of Ryan's cash into an interest bearing account belonging to Ryan because it further allowed "[t]he Guardian [to] make such disbursements from said monies as may be required to provide for the medical and physical needs of the minor." Ex. 3, at 1. And the superior court continued Ryan's guardianship when he became an adult under the same terms. Any money Ryan received included Grand Ronde distributions, so Ronald exerted unauthorized control when he deposited these checks into his account.

¶59 At trial, Beagle's testimony supports this interpretation:

[BEAGLE:] When I contacted Grand Ronde, I found out that there were payments being made to the guardianship of Ryan Cuthbert from the tribe periodically for disbursements as income.

. . . .

[THE STATE:] Okay. And so these -- are these regular payments?

[BEAGLE:] Yes. They come out twice a year.

RP at 524-25.

¶60 Later, under redirect examination, the following discussion took place:

[THE STATE:] Mr. Beagle, if I understood your answer to [defense counsel] correctly, you were indicating that [Ronald] had the ability to transfer funds from the guardianship account to his personal account.

[BEAGLE:] That's incorrect. What I meant to state was that he had the ability to transfer from a guardianship account to another guardianship account. He did not have the authority to transfer to a personal account.

. . . .

[THE STATE:] . . . So I'm clear, you're saying that [Ronald] didn't have authority from the court to make transfers outside the guardianship funds.

[BEAGLE:] That is correct.

RP at 608-09. The record supports the jury's finding that Ronald exerted unauthorized control over Ryan's checks from the Grand Ronde when he deposited them into his personal accounts. Accordingly, we hold that there was sufficient evidence on counts 8 and 13 to support the jury's verdict; thus, Ronald's sufficiency claim fails. We note, however, that count 2 is reversed and remanded based on the trial court's ruling curtailing use of evidence supporting Ronald's defense to that count.

V. CUMULATIVE ERROR

¶61 Finally, Ronald argues that cumulative trial court errors warrant reversal of his convictions. We apply the cumulative error doctrine "when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial." *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Here, an accumulation of errors did not deny Ronald a fair trial and we hold that this claim fails.

¶62 We reverse count 2—regarding the Grand Ronde check offset and authorizing court order—and remand for further proceedings.

¶63 We affirm all other convictions.

ARMSTRONG, J., concurs.

¶64 QUINN-BRINTNALL, J. (dissenting in part) — I agree with the majority opinion upholding 16 of Ronald James Cuthbert's (Cuthbert) 17 convictions. But because evidence of the restraining order finding Cuthbert in contempt but authorizing him to keep the funds he misappropriated was

irrelevant, I dissent from that portion of the majority opinion holding that the trial court abused its discretion and erred by excluding the restraining order from the jury's consideration.

¶65 Relevant evidence is that which tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. ER 401. But the trial court properly excludes even relevant evidence when its probative value is substantially outweighed by the prejudicial nature of that evidence. ER 403. Here the documentary evidence at issue holds Cuthbert in contempt and was more prejudicial than probative. Accordingly, the trial court did not abuse its discretion when it denied Cuthbert's motion to admit the order. *Reed v. Streib*, 65 Wn.2d 700, 709, 399 P.2d 338 (1965) (an appellate court may sustain a trial court on any correct ground, even though that ground was not considered by the trial court).

¶66 In addition, count 2 of the information charged Cuthbert with the crime of first degree theft as follows:

COUNT 02 -- THEFT IN THE FIRST DEGREE - 9A.56.020(1)(a)/ 9A.56.030(1)(a)

That he, RONALD JAMES CUTHBERT, in the County of Clark, State of Washington, on or about December 30, 2004 did wrongfully obtain or exert unauthorized control over the property of another, having a value exceeding $1,500, to wit: funds in the amount of $5,5770 [sic], with intent to deprive the other of said property, contrary to Revised Code of Washington 9A.56.020(1)(a) and 9A.56.030(1)(a) and 9A.56.010(18)(c).

Further, the State of Washington notifies [Cuthbert] that it is seeking a sentence above the standard sentencing range based upon the following aggravating circumstances(s):

[Cuthbert] has committed multiple current offenses and [Cuthbert's] high offender score results in some of the current offenses going unpunished. RCW 9.94A.535(2)(c).

[Cuthbert] knew or should have known that the victim of the current offense was particularly vulnerable or incapable of resistance. RCW 9.94A.535(3)(b).

2 Clerk's Papers (CP) at 221.

¶67 The bill of particulars for count 2 reads:

> The State alleges that in May, 2004 [Cuthbert], acting as Guardian for Ryan Cuthbert, applied for a distribution of benefit funds from the Grande [sic] Ronde tribe. The State further alleges that on or about December 30, 2004, after having been removed as Guardian for Ryan Cuthbert, [Cuthbert] obtained the distribution check, which was payable to Ryan J. Cuthbert in the amount of $5,770.00, and deposited it into his personal account # 9299 at U.S. Bank, and thereafter converted the funds to his own use.

1 CP at 62-63.

¶68 As the bill of particulars clearly states and the evidence at trial established, Cuthbert received a benefit funds check from the Grand Ronde tribe, which was payable to Ryan Cuthbert. Despite the fact that he had been removed as Ryan Cuthbert's guardian, Cuthbert deposited the check into his personal bank account on December 30, 2004.

¶69 As a defense to the crime charged, Cuthbert sought to admit an order of the Clark County Superior Court dated February 4, 2005, that he claimed, and the majority assumes, memorialized oral statements made on the record in that case. The order, titled "Restraining Order and Continuing Injunction and Order of Contempt," reads in relevant part as follows:

> IT IS HEREBY ORDERED that RONALD CUTHBERT and DEBORAH CUTHBERT, and their successors, employees and agents, are hereby continued to be restrained and enjoined from the following acts until further ordered by this Court.
>
> 1. [Restrained from transferring, selling, giving, removing, encumbering, concealing, or disposing of any real property belonging to the marital community or businesses owned by the Cuthberts.]
>
> 2. [Restrained from disposing of any personal property owned by them or their business.]
>
> . . . .

6. . . . RONALD CUTHBERT is currently in contempt of this Court's prior Restraining Orders entered on September 10, 2004, August 24, 2004, October 17, 2004 and December 17, 2004 and is ordered to immediately comply with the terms of this Order.

7. . . . The parties will work together to get Ryan Cuthbert evaluated to determine if he can benefit from additional therapies or services. Mr. McCray will provide all sale documents regarding the sale of the Tillamook property to Ms. Dimitrov by 5:00 pm on February 7, 2005. The guardian ad litem will stop her investigation. Beagle, Burke and Associates [(BBA)] will pay Mr. Cuthburt [sic] $1500 per month for Ryan's care and living expenses commencing June 10, 2004 less the $5770.00 check received by Mr. Cuthbert from the Grand Ronde, together with additional reasonable expenses incurred by Mr. Cuthbert on Ryan's behalf if receipts are provided to BBA, and any medical expenses paid for by Mr. Cuthbert.

*Mr. Cuthbert will provide the $8000 cashier's check to Mr. McCray by 5 pm Feb. 7th.

Ex. 48.

¶70 Cuthbert argued that this order was evidence that he did not intend to deprive Ryan Cuthbert of the $5,770 proceeds of the Grand Ronde check. But the order is irrelevant because Cuthbert committed the theft of funds when he misappropriated the Grand Ronde check and deposited it in his personal account. The fact that the court later agreed with Cuthbert that he was entitled to a caretaking fee of $1,500 per month does not mean that Cuthbert was entitled to pay himself the fee by cashing a check made payable to Ryan Cuthbert and placing the proceeds in his own personal account. In this regard, the trial court's order does no more than offset the amount Ryan Cuthbert's legitimate guardians must pay Cuthbert for Ryan Cuthbert's caretaking by the amount Cuthbert already misappropriated to himself.

¶71 The crime of embezzlement is completed when the conversion occurs, *State v. Woll*, 35 Wn. App. 560, 566, 668 P.2d 610 (1983), and the intent to return the money is not a

valid defense. *State v. Dorman*, 30 Wn. App. 351, 355, 633 P.2d 1340 (intent to permanently deprive is not an element of theft by embezzlement), *review denied*, 96 Wn.2d 1019 (1981). In a similar vein, the misappropriation of funds as an advance on a caregiver fee a court later determines to be appropriate is also not a valid defense. In *State v. Grimes*, 111 Wn. App. 544, 556, 46 P.3d 801 (2002), *review denied*, 148 Wn.2d 1002 (2003), the trial court allowed evidence of Grimes's intent at the time of the theft but excluded evidence of later repayment. Grimes appealed the trial court order to suppress evidence that he repaid his victims, claiming that the suppression order " 'effectively presume[d] guilt in advance of presentation of the defense.' " *Grimes*, 111 Wn. App. at 556. Division One of this court rejected Grimes's contention and held that the intent to permanently deprive is not an element of the crime of theft by embezzlement because the crime is committed at the time of conversion and, thus, evidence of Grimes's intent to repay his victims was not relevant to the crime charged. *Grimes*, 111 Wn. App. at 556 (citing *State v. Ager*, 128 Wn.2d 85, 94, 904 P.2d 715 (1995)). As such, Division One held that the trial court properly excluded evidence of Grimes's repayment. *Grimes*, 111 Wn. App. at 556.

¶72 Here, too, Cuthbert completed the offense the moment he misappropriated Ryan Cuthbert's Grand Ronde check and deposited it in his personal bank account. The subsequently issued restraining order suggesting that Cuthbert was entitled to payment of a caretaking fee does not ratify the earlier theft of Ryan Cuthbert's Grand Ronde check. Much like evidence of a defendant's intent to repay his embezzlement victims, the restraining order here is irrelevant because Cuthbert completed the crime when he misappropriated the funds. The restraining order does not provide a legal defense or justification for Cuthbert's illegal check cashing actions, but rather offsets the caregiver fee amount owing to Cuthbert by the amount he had already misappropriated for his own use.

¶73 Because Cuthbert's intention was to convert the proceeds of the Grand Ronde check to his own use under a

claim that it was payment he was owed for services he had rendered to Ryan Cuthbert, the restraining order was not evidence that tended to prove an issue of consequence in the trial on count 2, and the trial court did not abuse its discretion in excluding the order. Therefore, I respectfully dissent from that portion of the majority opinion reversing Cuthbert's first degree theft conviction as charged in count 2.

Review denied at 169 Wn.2d 1008 (2010).